

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-15-2006

# In Re: Wilson

Precedential or Non-Precedential: Precedential

Docket No. 05-4040

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"In Re: Wilson " (2006). *2006 Decisions*. Paper 1000.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1000

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4040

———

IN RE: YUVONNE B. WILSON, et al.,
Petitioners

———

On Petition for a Writ of Mandamus
to the United States District Court
for the Eastern District of Pennsylvania
(Related to MDL-1203)
District Judge: Honorable Harvey Bartle, III

———

Argued December 13, 2005

Before: SLOVITER, SMITH and STAPLETON,
Circuit Judges.

(Filed May 15, 2006)

———

Sylvia Davidow
Fleming & Associates
Houston, TX 77056

Thomas C. Goldstein   (Argued)
Goldstein & Howe
Washington, DC 20016

Jonathan S. Massey   (Argued)
Bethesda, MD 20817

        Attorneys for Petitioners Yuvonne B. Wilson, et al.

Robert D. Rosenbaum   (Argued)

Arnold & Porter
Washington, DC 20004

Michael T. Scott
Paul B. Kerrigan
Milind M. Shah
Reed Smith
Philadelphia, PA 19103-7301

Peter L. Zimroth
Arnold & Porter
New York, NY 10022-4690

> Attorneys for Respondent Wyeth Corp. f/k/a American
> Home Products Corporation

Fred S. Longer
Arnold Levin
Michael D. Fishbein
Levin, Fishbein, Sedran & Berman
Philadelphia, PA l9l06

> Attorneys for Respondents Plaintiffs' Management
> Committee and Plaintiffs' Class Counsel

Wm. Terrell Hodges, John F. Keenan, Robert L. Miller, Jr., D. Lowell Jensen, Kathryn H. Vratil, J. Frederick Motz and David R. Hansen and Harvey Bartle, III,

> Nominal Respondents

---

OPINION OF THE COURT

---

SLOVITER, <u>Circuit Judge</u>

The petitioners in this mandamus proceeding, all represented by the same counsel, are several thousand of the

approximately 30,000 to 35,000 plaintiffs with suits currently pending before the United States District Court for the Eastern District of Pennsylvania ("the MDL Court") as part of the Multidistrict Diet Drug Product Liability Litigation, MDL-1203. The Judicial Panel on Multidistrict Litigation ("JPML") transferred petitioners' cases to the MDL Court for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407(a). Petitioners contend that the generic or common discovery phase has concluded in MDL-1203, and thus they moved the JPML to remand their cases for case-specific discovery and trial in the federal district courts from which they were transferred ("the transferor courts"). The JPML refused to remand because it determined that MDL-1203 continues to promote the just and efficient conduct of proceedings in the diet-drug cases, and the MDL Court itself had declined to suggest the remand of petitioners' cases. Petitioners argue that the JPML committed a clear error of law because a remand was required under § 1407(a) once pretrial proceedings had concluded on issues common to all cases. Petitioners ask, therefore, that we grant mandamus and direct the JPML to return their cases to the transferor courts for further proceedings.[1]

## I.[2]

---

[1] In a separate opinion filed today, we address an alternative mandamus request by a subset of these same petitioners for a remand of their cases to the state courts where most, if not all, of them originated. See In re Briscoe, C.A. No. 04-4086. The common thread between the petitioners before us and the petitioners in In re Briscoe is that they are all represented by the Houston, Texas, law firm of Fleming & Associates, LLP.

[2] The extensive background to the MDL-1203 litigation need not be set forth in full, and thus we limit our discussion to the facts pertinent to this mandamus request. For additional background, see In re Briscoe, C.A. No. 04-4086; In re Diet Drugs, 401 F.3d 143 (3d Cir. 2005); In re Diet Drugs, 385 F.3d 386 (3d Cir. 2004); In re Diet Drugs, 369 F.3d 293 (3d Cir. 2004); In re Diet Drugs, 282 F.3d 220 (3d Cir. 2002).

3

On September 15, 1997, respondent Wyeth (then known as American Home Products Corporation) withdrew from sale on the United States market its widely prescribed appetite suppressants, or "diet drugs," which were sold under the trade names of Pondimin and Redux. Approximately six million people in the United States had taken one or both of the diet drugs, which studies have linked to, inter alia, valvular heart damage. After the diet drugs were withdrawn from the market, thousands of lawsuits were filed against Wyeth in state and federal courts nationwide.

In December 1997, the JPML created MDL-1203 and transferred the pending federal cases to the MDL Court "for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). In early 1998, the MDL Court formed a Plaintiffs' Management Committee to coordinate discovery and other activities, and it appointed a Special Discovery Master under Federal Rule of Civil Procedure 53. The MDL Court also established numerous requirements for the conduct of discovery, including deposition guidelines, a requirement that plaintiffs complete a fact sheet regarding their individual claims, a list of medical providers, and the submission of medical authorizations to release patients' records.[3] The MDL Court created a document depository through which discovery materials are made available to transferor courts upon the remand of cases. The MDL Court further established a system through which each case transferred to MDL-1203 receives a Discovery Initiation Date, which sets in motion a timetable for the completion of fact and expert discovery. Significantly, the MDL Court from its inception envisioned that the conduct of pretrial proceedings in MDL-1203 would encompass fact and expert discovery that was both generic (i.e., of widespread application to many cases) and case-specific (i.e., that pertained solely to an individual plaintiff's claims).

---

[3]On July 23, 2003, the MDL Court updated the initial disclosure requirements, including the adoption of a revised fact sheet and medical authorization form.

4

In April 1999, Wyeth and counsel for plaintiffs in the then-pending state and federal court actions began global settlement talks. In November 1999, after almost two years of extensive liability discovery as part of the MDL-1203 proceedings, the parties reached a tentative Nationwide Class Action Settlement Agreement ("Settlement Agreement"). The proposed class of plaintiffs included all persons in the United States, including their representatives and dependents, who had ingested either or both of the diet drugs. The MDL Court held a hearing on fairness, and on August 28, 2000, it certified the class and approved the Settlement Agreement (with four amendments).

Under the settlement terms, Wyeth agreed to pay up to $3.75 billion to fund benefits to class members, who agreed in return to release Wyeth from all claims (with one exception not relevant here) arising out of their ingestion of the diet drugs. The Settlement Agreement was also devised to afford medically eligible class members the chance to opt out of its terms at various points in the future to pursue the alternative of filing suit against Wyeth for compensatory damages. Putative class members were entitled to opt out from participation in the Settlement Agreement by March 30, 2000, and thereby forego all benefits and restrictions conferred under the Settlement Agreement by excusing themselves from class membership. Diet-drug users who did not exercise this initial opt-out right became class members but were afforded subsequent opportunities, if medically eligible under criteria specified by the terms of the Settlement Agreement, to exercise a so-called "downstream" opt-out right.[4] In re Diet Drugs 369 F.3d 293, 299 (3d Cir. 2004). Class members who choose to opt out

_____

[4]The downstream opt out could be exercised at "intermediate" or "back-end" stages. The petitioners before us have not specified whether they are intermediate or back-end opt-outs, but their counsel note that there is no legal distinction between the two categories for purposes of this mandamus proceeding. We thus refer to petitioners generically as "downstream" opt-outs.

downstream receive no compensation under the Settlement Agreement but are permitted to file suit against Wyeth and others with certain restrictions, the most prominent of which is a bar against seeking an award of punitive damages. In return for the limitation on available damages, Wyeth agreed not to assert, inter alia, a statute of limitations defense to the actions.

The thousands of downstream opt-out petitioners presently before us filed suit against Wyeth and other defendants. Some petitioners filed suit individually, although many had joined in multi-plaintiff complaints. It appears that all, or almost all, of the petitioners originally filed their actions in state courts between 2002 and 2004. Wyeth removed the suits to federal court. The JPML then transferred the cases, the majority of which had been docketed in the federal district courts in Texas, to MDL-1203. The rest of petitioners' suits were transferred from federal district courts in twenty different states.

Before petitioners' cases arrived in MDL-1203, the MDL Court initiated a program for suggesting the remand of actions that had completed coordinated pretrial proceedings.[5] In May 2001, the MDL Court entered Pretrial Order ("PTO") No. 1962 in which it noted that many of the then-pending cases had completed discovery on the issues amenable to resolution in MDL-1203. The MDL Court promptly suggested approximately thirty-eight cases for remand.

---

[5]After a case completes the pretrial process in an MDL proceeding, it is remanded to the transferor district court for any remaining proceedings and trial. 28 U.S.C. § 1407(a). The MDL court has no authority to remand a case on its own; rather, the JPML must order the remand. In re Roberts, 178 F.3d 181, 184 (3d Cir. 1999). The transferee court nevertheless plays a vital role in the remand process by entering an order in which it suggests to the JPML that a case is ready for remand. "A suggestion to remand from the [MDL] court provides the indication that the coordinated or consolidated pretrial proceedings assigned to it by the [JPML] have been successfully completed." 17 James Wm. Moore et al., Moore's Federal Practice ¶ 112.07[3][a] (3d ed. 2005).

6

Since May 2001, the number of plaintiffs with cases pending in MDL-1203 has increased dramatically – from some 3,000 in 2001 to approximately 30,000 to 35,000 as of January 2006. This growth in the MDL-1203 docket appears to have stemmed largely from the structure of the Settlement Agreement itself, which allows class members to opt out "downstream." Class members were required to exercise an intermediate opt-out right by May 3, 2003. Prior to that time, the cases in MDL-1203 were brought mainly by putative class members who had opted out at the initial, pre-class certification stage. After approval of the Settlement Agreement, tens of thousands of diet-drug users exercised downstream opt-out rights and filed suit against Wyeth.[6] Wyeth subsequently removed a substantial number of those suits from state to federal court.[7] The JPML transferred the cases for inclusion in MDL-1203, which explains the increased caseload. Moreover, many of the cases came to MDL-1203 as multi-plaintiff actions. In March 2004, as part of an effort to facilitate the administration of its docket and to resolve misjoinder issues, the MDL Court ordered the severance of all multi-plaintiff suits and directed each plaintiff to file a Severed and Amended Complaint.[8] Consequently, numerous multi-plaintiff actions are now proceeding as individual suits, a fact reflected in the substantial number of pending cases.

Petitioners contend that the increased caseload has rendered the MDL Court unable to continue with its 2001 program of suggesting remand for cases that have completed common discovery. They argue that there is only "plaintiff-

_____

[6]Petitioners have estimated that "some 60,000 to 70,000 class members" opted out of the Settlement Agreement to pursue litigation against Wyeth.

[7]Petitioners contend that the removals were improper, an issue raised in the companion case of In re Briscoe, C.A. No. 04-4086.

[8]Notably, the MDL court's severance of the actions is without prejudice to any party's right to request consolidation of the severed actions upon remand to the transferor court for trial.

specific" discovery to be completed in numerous pending suits, like their own. Petitioners claim that MDL-1203 has become an inefficient vehicle for managing the diet-drug cases. Moreover, they argue that their suits must now be remanded to the transferor courts as a matter of law because generic liability discovery has been completed.

In May 2003, petitioners filed a motion with both the JPML and the MDL Court seeking to dissolve MDL-1203 and asking for a remand of all pending cases to the transferor courts, including cases in which Fleming & Associates, LLP ("the Fleming firm") was not counsel.[9] On August 25, 2003, the MDL Court rejected the motion, which it treated as a request for a suggestion of remand. The Court noted that while generic liability discovery had ended, pretrial proceedings on common factual questions had yet to be completed. The MDL Court observed that proceedings were ongoing in most, if not all, cases pending in MDL-1203, and the MDL Court had recently streamlined its discovery process. Furthermore, the nature of the ongoing discovery was generally similar from case to case, thereby making MDL-1203 effective in providing consistency and reducing duplication of effort and expense.

The Court added that remand, or dissolution of MDL-1203, would be premature because issues common to all pending cases continually arise. The Court twice had enjoined downstream opt-out plaintiffs from pursuing punitive damages against Wyeth in violation of the Settlement Agreement. If punitive damages were awarded in downstream cases, Wyeth's financial viability could be jeopardized, leaving many diet-drug plaintiffs unable to recover compensation for their injuries. The MDL Court found it critical that it continue to supervise the active MDL-1203 cases to ensure a unified interpretation of the Settlement Agreement and a consistent enforcement of its terms. The Court also anticipated that issues related to the eligibility of

_____

[9]Counsel for additional petitioners also filed remand motions with the MDL court, but those petitioners are not parties to this mandamus proceeding.

8

class members to opt out would arise, the resolution of which requires a uniform and consistent application of detailed medical criteria. Finally, the MDL court noted that it had faced common patterns in allegations that plaintiffs had fraudulently joined defendants to defeat federal jurisdiction, raising issues that touch upon many cases. Thus, the Court declined to suggest either dissolution of MDL-1203 or a remand of its pending cases.

On October 30, 2003, the JPML also rejected petitioners' motion, noting that the Plaintiffs' Management Committee, among others, was opposed to petitioners' request for a remand. The JPML found that centralization continued to serve the convenience of parties and witnesses and to promote the just and efficient conduct of the litigation. It observed that the MDL Court remains in the best position to set the future course for the diet-drug cases. Because the MDL Court had declined to suggest a remand, the JPML was unconvinced that it should compel one.

According to petitioners, they then waited eighteen months with the expectation that their cases would be suggested for remand. In November 2004, petitioners sought another suggestion of remand, again arguing that case-specific discovery was all that remained and that retention of their cases was no longer justified. Petitioners stated that "[w]ith the exception of perhaps cardiology experts, every witness left to depose, every document left to produce and every medical record left to review are all located in Plaintiffs' home states, not in Philadelphia, Pennsylvania." App. at 268. Unlike in their prior motion, petitioners did not request a dissolution of MDL-1203, and they sought a suggestion of remand in their own cases, not all pending cases.

On January 27, 2005, the MDL Court declined to suggest a remand, concluding that petitioners' request was "without substance" and premature. App. at 284. The Court explained that it promptly enters a suggestion of remand when a case is ready for return to a transferor court, and that it would continue

9

to follow that practice.[10]

On March 30, 2005, Petitioners filed another motion for remand with the JPML. They argued, inter alia, that the MDL court's remand program was at a "virtual standstill," as evidenced by its suggestion of remand in "fewer than 100 cases" since 2001.[11] App. at 369-70.

On June 20, 2005, the JPML denied the remand motion. It again found that a remand would be inappropriate because centralization continues to promote the just and efficient conduct of the litigation. The JPML added that the MDL Court had "recently overseen the institution of a new settlement process in the MDL-1203 proceedings."[12] App. at 2. Absent a suggestion

---

[10]The MDL court's docket reflects that it issued twenty-five separate orders between May 2001 and August 2005 in which it suggested remands.

[11]Petitioners' counsel clarified at argument before this court that the MDL Court has remanded "about 150" cases. Oral Arg. Tr. at 81. For its part, Wyeth contends that the relatively low number of cases remanded is due to the fact that the parties "had settled virtually all of the cases in MDL-1203 prior to any such remand." Respondent's Br. at 11.

[12] Wyeth describes this "new settlement process" as follows:

On January 18, 2005, Wyeth and counsel representing a number of plaintiffs with cases in MDL 1203 advised [the MDL court] that those parties had developed a proposed process by which large numbers of cases might be negotiated and settled. The process provides a methodology for valuing some categories of claims and provides a structure for individualized negotiations between Wyeth and lawyers representing diet drug claimants. Pursuant to that motion, [the MDL court] entered PTO 4389, establishing a process by which participating law firms and Wyeth could obtain automatic stays of all proceedings in their cases by notifying the Special Master that those plaintiffs represented

10

of remand from the MDL Court, the JPML found no persuasive reason to order one, and it urged petitioners to continue to avail themselves of the efficiencies provided by inclusion in MDL-1203.

Petitioners have turned to this court with the filing of their petition for a writ of mandamus.

## II.

The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court has identified "three conditions"

---

> by participating law firms had agreed with Wyeth to participate in that settlement process. . . . [A]lmost all the plaintiffs with cases pending in MDL 1203 have entered into such stipulations and are in various stages of settlement negotiations.
>
> On September 2, 2005, [the Fleming firm] and Wyeth entered into such a stipulation, which was filed with the Court, advising it that [the Fleming firm] had agreed to participate in settlement negotiations on behalf of all Petitioners [to the present mandamus proceeding]. . . . Accordingly, all of the Petitioners' cases are stayed while settlement discussions continue.

Respondent's Brief at 8-9.

According to counsel for petitioners, the settlement discussions with Wyeth concluded in December 2005. The standstill agreement for petitioners' cases expired on January 1, 2006, and discovery recommenced on February 1, 2006. Notably, counsel for Wyeth estimated that "about 11,000" MDL-1203 cases were settled as part of the new settlement process. Oral Arg. Tr. at 66.

11

that a petitioner must meet before a reviewing court may issue a writ of mandamus: the petitioner must establish both that (1) there is "no other adequate means" to attain the relief sought and (2) a right to the writ that is "clear and indisputable"; and (3) even if the first two conditions are met, the reviewing court in its discretion must conclude that the writ "is appropriate under the circumstances." Cheney v. U.S. Dist. Court for Dist. of Columbia, 542 U.S. 367, 380-81 (2004) (citations omitted).

Petitioners have satisfied the first condition to mandamus in that they have no other adequate means to attain relief from the JPML's order refusing to remand their cases. Mandamus is the sole means through which petitioners can seek review of the JPML's order. See 28 U.S.C. § 1407(e) ("No proceedings for review of the panel may be permitted except by extraordinary writ pursuant to the provisions of [§ 1651]."). This court is the proper venue for the mandamus petition. See id. ("Petitions for an extraordinary writ to review an order to transfer or orders subsequent to transfer shall be filed only in the court of appeals having jurisdiction over the transferee district.").

We have observed that because of the "great weight" that the JPML places upon an MDL court's suggestion of remand, "only those plaintiffs who actually sought suggestion of remand from the [MDL] court have satisfied the first prong of the mandamus inquiry." In re Patenaude, 210 F.3d 135, 142 (3d Cir. 2000). Here, the parties do not dispute that all of the petitioners joined in the second request that the Fleming firm filed in the MDL court for a suggestion of remand. The MDL court denied that request on the merits. Petitioners have thus met the first condition to mandamus. We focus, then, on whether they have a clear and indisputable right to a remand of their cases.

## III.

The second condition to mandamus requires a showing that the court under review "committed a clear error of law at least approaching the magnitude of an unauthorized exercise of judicial power, or a failure to use that power when there is a duty to do so." In re Federal-Mogul Global, Inc., 300 F.3d 368, 384

12

(3d Cir. 2002) (quotation marks and citation omitted). In addition, "mandamus can apply to discretionary acts where petitioners can demonstrate a 'clear abuse of discretion.'" Patenaude, 210 F.3d at 141 (quoting Mallard v. U.S. Dist. Court, 490 U.S. 296, 309 (1989)).

In arguing that the JPML committed a clear error of law by failing to order a remand, petitioners rely upon the language of § 1407(a), which provides:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for <u>coordinated or consolidated pretrial proceedings</u>. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. <u>Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred</u> unless it shall have been previously terminated: Provided, however, That the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded.

28 U.S.C. § 1407(a) (emphasis added).

Petitioners contend that the JPML failed to comply with § 1407(a) by refusing a remand at what they claim was the conclusion of "coordinated or consolidated pretrial proceedings" in MDL-1203. Mandamus Ptn. at 12. Significantly, petitioners do not appear to dispute that the ongoing MDL-1203 proceedings qualify as "pretrial" in nature, as those proceedings have primarily involved discovery in individual cases and the recent settlement process. See Patenaude, 210 F.3d at 144 (discussing the meaning of "pretrial" under § 1407(a) and holding settlement conferences are pretrial proceedings). Rather, petitioners' challenge is directed to

13

whether the proceedings can be considered "coordinated or consolidated" in light of the fact that generic liability discovery concluded years ago. Petitioners argue that the recent settlement process lacked judicial oversight, and that MDL treatment is unnecessary when remaining discovery is case specific. They contend that the MDL process only serves to delay the resolution of their cases.

Although petitioners argue that our decision in Patenaude supports their position, that case clearly cuts the other way. In Patenaude, plaintiffs with injuries allegedly suffered from asbestos exposure had their actions transferred to a multidistrict litigation, where the cases remained for several years as part of a pretrial process that did not involve global discovery. 210 F.3d at 138-39. The discovery in Patenaude related to a pending class action, individual or groups of claims, and to "litigation screening companies, the physicians they employ, and the nature of their contracts with plaintiffs' firms." Id. at 139. In addition, the MDL judge was actively engaged in the process of seeking to settle pending cases. Id. at 139-40. A group of plaintiffs sought mandamus to compel a remand of their cases to the transferor courts, arguing that "coordinated or consolidated" under § 1407(a) should be interpreted to mean that pretrial proceedings are at an end when an MDL court "ceases to conduct proceedings common to all." Id. at 143-44.

Looking to the guidance provided by the Supreme Court's decision in Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998), this court rejected the petitioners' narrow reading of the statutory language, concluding instead that the phrase "'coordinated or consolidated' is to be interpreted broadly." Id. at 142 (citing Lexecon, 523 U.S. at 33-34). Indeed, we observed that "a proceeding that relates only to a single individual's case or claim can nonetheless be coordinated," as coordination can be found even if common issues are present only in relation to cases that have already terminated. 210 F.3d at 143. Moreover, "[t]o be coordinated, it is not necessary that common issues are being contemporaneously addressed" or that "any one issue be common to all cases, so long as issues 'overlap.'" Id. at 143

14

(citing <u>Lexecon</u>, 523 U.S. at 34).  Applying these principles, we denied the mandamus petition in <u>Patenaude</u> because, inter alia,

> overlapping issues "ha[ve] been considered": the transferee court oversaw the initial attempts at global settlement and set forth procedures applicable to all regarding the mandatory exchange of information, the [settlement] negotiation process, and the prioritizing of cases.  Moreover, the transferee court continues to conduct discovery regarding the use of litigation screenings that overlaps many of the cases in MDL-875.  Although there is no allegation that litigation screenings were conducted in any of the plaintiffs' individual cases, this issue is common to many cases from many different transferor districts.

210 F.3d at 144 (citations omitted).  We held that "because individual settlement negotiations and conferences are ongoing in the plaintiffs' individual cases, and because the transferee court is conducting discovery on overlapping issues that affect many asbestos cases, even if not the plaintiffs', coordinated pretrial proceedings have not concluded[.]"  <u>Id.</u> at 146.

Petitioners here likewise seek to equate the completion of common discovery with the end of "coordinated or consolidated" proceedings.  As we made clear in <u>Patenaude</u>, the test is not whether proceedings on issues common to all cases have concluded; it is whether the issues overlap, either with MDL cases that have already concluded or those currently pending.  Moreover, the overlapping issues do not necessarily need to touch the petitioners' particular cases.  Under this standard, we find adequate evidence that the proceedings in MDL-1203 qualify as "coordinated or consolidated."

Just prior to the filing of petitioners' second request for a remand with the JPML, the MDL Court established a process for plaintiffs to seek an automatic stay in order to pursue settlement negotiations with Wyeth.  Within days after commencing this mandamus proceeding, petitioners themselves committed to the process and stipulated to a stay of their cases.  Given its

15

familiarity with the diet-drug litigation, the MDL court was, as the JPML concluded, best positioned to aid the discussions between the plaintiffs and Wyeth. While the Fleming firm apparently did not settle the cases of any of the petitioners before us, Wyeth has estimated that "about 11,000" cases were settled as a result of the process. Oral Arg. Tr. at 66.

Petitioners argue that no court-managed negotiations took place, a fact that they view as pertinent in distinguishing the MDL-1203 process from Patenaude. Petitioners note that "all settlement negotiations [we]re private discussions, involving discrete groups of claimants represented by separate law firms, and not overseen by the MDL court." Mandamus Ptn. at 18. In Patenaude, the MDL judge was actively involved in prioritizing the cases on its docket and in directing the parties into a process for the discussion of settlement, with a focus on addressing the claims of the most seriously ill plaintiffs first. 210 F.3d at 140. The court established procedures for the exchange of information and the negotiation of settlements, and if the settlement process failed, the court considered whether immediate remand to the transferor court was appropriate. Id. The court's active management of the settlement process resulted "in numerous cases being resolved" as well as the remand of a substantial number of cases to the transferor courts. Id.

Petitioners are correct that the MDL Court here played a far less active role in the settlement process than was the case in Patenaude. Nevertheless, our determination in Patenaude that § 1407(a) was satisfied did not hinge on the MDL judge having engaged in centralized management of the negotiations. Rather, we held that the phase "coordinated and consolidated" was broad enough to include the conduct of individual, non-global settlement negotiations, which in Patenaude happened to be conducted under the close supervision of the MDL judge.

Here, in addition to granting automatic stays, the MDL Court authorized the Special Master to schedule status conferences involving Wyeth, counsel for the plaintiffs, and members of the Claims Facilitating Committee so that it could

16

remain updated on the settlement process. Because of its familiarity with the diet-drug litigation, the MDL court (or its Special Master) was in a better position than any transferor court to facilitate discussions between the plaintiffs and Wyeth should the need have arisen. We recognized in Patenaude that a remand may be refused "where the possibility exists that even individual settlement negotiations will be more efficient if facilitated by a judge who is intimately familiar with the general issues and many of the parties." 210 F.3d at 145. In short, the settlement process – inasmuch as it was facilitated by the Court's willingness to stay proceedings in the MDL-1203 cases; likely came about because of the existence of MDL-1203; involved numerous plaintiffs; and was highly successful in resolving cases – was a "coordinated" proceeding under § 1407(a).

Petitioners also argue that the discovery proceedings in MDL-1203 are insufficient to satisfy § 1407(a). The record reflects otherwise. The MDL Court has established a comprehensive discovery schedule, which includes a procedure for the conduct of fact and expert depositions for witnesses who are expected to testify in more than twenty-five cases. The Special Master has assigned each Severed and Amended Complaint a Discovery Initiation Date ("DID") and set deadlines for the completion of discovery in those cases.[13] As of September 2005, DIDs were set in approximately 6,700 cases with plaintiffs represented by the Fleming firm. Some 1,200 of those cases had a DID of December 1, 2004, or earlier, meaning they were scheduled for the completion of discovery no later than November 1, 2005. Approximately 4,400 of the cases had DIDs of August 1, 2005.

Moreover, the substantive issues in discovery overlap. The Fleming firm designated one medical expert, Dr. Gerard Polukoff, in more than 350 of its cases. Several other medical

---

[13]Plaintiffs who have been diagnosed with a serious medical condition (including Primary Pulmonary Hypertension and valvular heart disease of sufficient severity) are eligible to be considered on an expedited basis for remand.

17

experts are designated in multiple cases. In addition, after plaintiffs argued that Wyeth should be required to pay the Fleming firm's experts for time spent reviewing medical records prior to depositions, the Special Master issued a single ruling that resolved this issue and was applicable to all pending Fleming cases.

Wyeth also contends (and petitioners do not dispute) that "large numbers of plaintiffs [were] diagnosed with valvular heart disease in mass echocardiogram screening operations organized by plaintiffs' counsel law firms. The manner in which those screening operations were conducted involves common issues among all the plaintiffs screened in the same echocardiogram operation." Respondent's Br. at 12. Discovery on this issue is akin to the proceedings in Patenaude regarding the plaintiffs' use of litigation screening companies. See Patenaude, 210 F.3d at 139. Indeed, Wyeth notes that depositions of the physicians who were involved in the mass echocardiogram screenings involve witnesses "who read hundreds or even thousands of echocardiograms and accordingly may give testimony relevant to large numbers of MDL cases."[14] Respondent's Br. at 15. Finally, the MDL court observed that issues common to many cases continue to arise, such as questions of enforcement and the eligibility of class members to opt out. The latter issue requires making an assessment of the medical requirements specified under the terms of the Settlement Agreement to ensure that the opt out is proper.

On this record, petitioners cannot meaningfully distinguish the discovery proceedings in MDL-1203 from the proceedings we deemed coordinated in Patenaude. Moreover, petitioners have failed to show that MDL-1203 no longer serves its purpose of promoting the just and efficient conduct of

---

[14] When asked at the oral argument to identify remaining overlapping issues, Wyeth responded that "we have had massive fraud on the part of plaintiffs. We have had massive instances of diagnoses based on improperly taken echocardiograms." Oral Arg. Tr. at 62. We, of course, express no opinion on this issue.

18

litigation concerning the diet drugs.

In Lexecon, the Supreme Court made it clear that § 1407(a) "obligates" the JPML to remand "when, at the latest, th[e coordinated or consolidated] pretrial proceedings have run their course." 523 U.S. at 34-35. The JPML's obligation to remand at that time is "impervious to judicial discretion." Id. at 35. However, when, as here, a remand is sought *before* the conclusion of coordinated or consolidated pretrial proceedings, the JPML's authority is discretionary. As we stated in Patenaude,

> Section 1407 expressly allows for remand "at or *before* the conclusion of . . . pretrial proceedings." Clearly, the [JPML] has the discretion to remand a case when everything that remains to be done is case-specific. This does not mean that consolidated proceedings have concluded at the point that only case-specific proceedings remain; rather, the court can at that point exercise its discretion to remand "before the conclusion of pretrial proceedings."

210 F.3d at 145 (quoting § 1407(a)). The JPML retains "unusually broad discretion" to carry out its functions, including "substantial authority . . . to decide how the cases under its jurisdiction should be coordinated." In re Collins, 233 F.3d 809, 811-12 (3d Cir. 2000).

Although petitioners argue in the alternative that it was a clear abuse of discretion for the JPML to refuse a remand, we are satisfied that the JPML acted within its authority, particularly given the absence of any suggestion from the MDL Court that a remand of petitioners' cases would be appropriate. "[T]he presence or absence of a remand recommendation from the transferee judge as a factor in the [JPML]'s decision-making process seems entirely reasonable." Patenaude, 210 F.3d at 146.

It is true, as petitioners note, that almost five years have passed since the MDL court entered its first order suggesting a remand of MDL-1203 cases. But we see no evidence that

19

petitioners' cases have languished impermissibly on the MDL Court's docket. Moreover, petitioners' cases were transferred to MDL-1203 after they exercised a downstream opt-out right, and their suits have not been pending for the entire five-year period. In any event, the current state of the MDL-1203 proceedings square with the requirements of § 1407(a). Like the JPML, we urge petitioners to continue to avail themselves of the efficiencies provided by inclusion in MDL-1203.

## IV.

All parties recognize that these cases must eventually be returned to their transferor courts and the only issue is when. We recognize the petitioners' frustration in the MDL court's reluctance to suggest remand at this time. We will of course continue to monitor the status as cases continue to raise the issues, but we believe the standards of mandamus continue to limit our ability and inclination to decide otherwise at this time. We have considered petitioners' remaining arguments but conclude that they are without merit and in need of no separate discussion. Because petitioners have not shown a clear and indisputable right to relief, we will deny their mandamus petition.

_____