

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-15-2006

# In Re: Karen Briscoe

Precedential or Non-Precedential: Precedential

Docket No. 04-4086

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"In Re: Karen Briscoe " (2006). *2006 Decisions.* Paper 1001.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1001

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 04-4086

————

IN RE: KAREN A. BRISCOE, et al.; ALFRED LARA, et al.;
WANDA T. KIZER, et al.*; DEBRA ALEXANDER, et al.;
RHONDA ALLEN, et al.; MARY GREEN, et al.;
GLENDA D. ABBOTT, et al.; and LESLIE BALES, et al.,
Petitioners

————

On Petition for a Writ of Mandamus
to the United States District Court
for the Eastern District of Pennsylvania
(Related to MDL-1203 & 99-cv-20593)
District Judge: Honorable Harvey Bartle, III

————

Argued December 13, 2005

Before: SLOVITER, SMITH and STAPLETON,
Circuit Judges.

(Filed May 15, 2006)

————

Sylvia Davidow
Fleming & Associates
Houston, TX 77056

_____
*Petitioners Wanda T. Kizer, et al., were dismissed as parties to
the petition for writ of mandamus pursuant to the Court's Order
dated July 11, 2005.

Thomas C. Goldstein   (Argued)
Goldstein & Howe
Washington, DC 20016

Jonathan S. Massey     (Argued)
Bethesda, MD 20817

     Attorneys for Petitioners Karen Briscoe, et al., Alfred
     Lara, et al., Debra Alexander, et al., Rhonda Allen, et al.,
     Mary Green, et al., Glenda D. Abbott, et al. and Leslie
     Bales, et al.

Fred S. Longer
Arnold Levin
Michael D. Fishbein
Levin, Fishbein, Sedran & Berman
Philadelphia, PA l9l06

     Attorneys for Respondents Plaintiffs' Management
     Committee and Plaintiffs' Class

Mary H. Smith
Smith & Smith
Houston, TX 77056-7133

     Attorney for Respondents George O. Crisp, M.D.,
     Jacqueline C. Hubbard, M.D., Frank Morehead, M.D.,
     James Vosberg, M.D. and Brent Wallace, M.D.

Russell G. Thornton
Stinnett Thiebaud & Remington
Dallas, TX 75202

     Attorney for Respondent Stinnett Thiebaud & Remington
     Physicians

Nancy N. Morrison
Naman, Howell, Smith & Lee

Waco, TX 76703

> Attorney for Respondents J. E. Madsen, M.D., James Weinblatt, M.D. and Morey Price, M.D.

Jay H. Henderson
Cruse, Scott, Henderson & Allen
Houston, TX 77019

> Attorney for Respondent Cruse, Scott, Henderson & Allen Physicians

Nik A. Mimari
Patterson & Wagner
San Antonio, TX 78229

> Attorney for Respondents Michael Hesitand, M.D. and Carmen Llauger-Meir, M.D.

Joseph M. Dunn
Evans & Rowe
San Antonio, TX 78216

> Attorney for Respondents Beau Meyer, M.D. and Sylvia Adams, M.D.

Ann P. Watson
Lara M. Price
Sheehy, Serpe & Ware
Houston, TX 77010

> Attorneys for Respondent Sheehy, Serpe & Ware Physicians

Douglas E. Markham
Callaway & Brenning
Houston, TX 77002

> Attorney for Respondent Esther G. Cruz, D.O.

John R. Robinson

Johnson & Sylvan
Dallas, TX 75270

      Attorney for Respondent Johnson & Sylvan Physicians

C. Timothy Reynolds
Steed Flagg
Rockwall, TX 75032

      Attorney for Respondent Tyson H. Barnes, Jr., M.D.

Robert D. Rosenbaum   (Argued)
Arnold & Porter
Washington, D.C.  20004

Michael T. Scott
Paul B. Kerrigan
Milind M. Shah
Reed Smith
Philadelphia, PA 19103-7301

Peter L. Zimroth
Arnold & Porter
New York, NY 10022-4690

      Attorneys for Respondent Wyeth Corp. f/k/a American
      Home Products Corporation

Mark A. Keene    (Argued)
Davis & Davis
Austin, TX 78759

      Attorneys for Respondent Stella Kwong, M.D.

Philip A. Sellers
Karotkin, Chase & Erwin
Houston, TX 77027

      Attorney for Respondents James Saxton, M.D., Raymond
      Neuman, M.D., Cornelia L. Agent, M.D. and Robert

Carroll, M.D.

Matthew W. Bobo
Broome, Bobo & Greene
Irving, TX 75039

 Attorney for Nancy Scheinost

Michael L. O'Brien
Houston, TX 77056

 Attorney for Amicus-Petitioner Opt-Out Plaintiffs'
 Counsel (O'Brien Group)

Bryan F. Aylstock
Aylstock, Witkin & Sasser
Pensacola, FL 32504

 Attorney for Amicus-Petitioner Opt-Out Plaintiffs'
 Counsel (Aylstock Group)

John E. Williams, Jr.
Williams Bailey Law Firm
Houston, TX 77017-5001

 Attorney for Amicus-Petitioner Williams Bailey Law
 Firm, LLP

Whitman B. Johnson, III
Currie, Johnson, Griffin, Gaines & Myers
Jackson, MS 39205

 Attorney for Amici-Respondents Alphonse M. Reed,
 M.D., et al.

Honorable Harvey Bartle, III,

 Nominal Respondent

OPINION OF THE COURT
_____

SLOVITER, <u>Circuit Judge</u>.

At issue in this case is the disposition of more than 14,000 actions filed by some 30,000 to 35,000 plaintiffs pending before the United States District Court for the Eastern District of Pennsylvania as part of the Multidistrict Diet Drug Product Liability Litigation, MDL-1203. Petitioners are 450 plaintiffs who originally filed their suits in Texas state courts. Defendant Wyeth removed the suits to the Texas federal district courts on the basis of diversity jurisdiction, even though petitioners had also named non-diverse parties as defendants. According to Wyeth, removal was proper because the additional defendants were named solely as a means to defeat federal jurisdiction. After the actions were transferred to the docket of MDL-1203, petitioners moved for a remand to state court. The District Court held that the non-diverse defendants were "fraudulently joined" because it determined that the claims against them are clearly time-barred under the governing Texas statute of limitations. It therefore dismissed all defendants except Wyeth, held that it has diversity jurisdiction, and denied the motions to remand. Claiming that the District Court committed a clear error of law, petitioners seek a writ of mandamus and ask that we direct the District Court to remand their cases to state court.[1]

**I.**

This court has previously set forth various facets of the background to MDL-1203 and its class action settlement agreement. <u>See</u> <u>In re Diet Drugs</u>, 401 F.3d 143, 147-48 (3d Cir. 2005) (dismissing appeals for want of jurisdiction and denying mandamus petition for review of award and allocation of interim

_____

[1]In a separate opinion filed today, we address an alternative mandamus request by these same petitioners as well as additional diet-drug plaintiffs for a return of their cases to the federal district courts from which they were transferred to MDL-1203. <u>See</u> <u>In re Wilson</u>, C.A. No. 05-4040, __ F.3d __ (3d Cir. 2006).

award of attorney's fees); In re Diet Drugs, 385 F.3d 386, 389-93 (3d Cir. 2004) (affirming approval of Sixth Amendment to the settlement agreement); In re Diet Drugs, 369 F.3d 293, 299 (3d Cir. 2004) (addressing District Court's injunction limiting scope of proceedings in state court); In re Diet Drugs, 282 F.3d 220, 225-29 (3d Cir. 2002) (addressing injunction against mass opt out from settlement agreement). We limit our discussion here to the facts pertinent to the present mandamus request.

On September 15, 1997, respondent Wyeth (then known as American Home Products Corporation) withdrew from sale on the United States market its widely prescribed appetite suppressants, or "diet drugs," known as fenfluramine ("Pondimin") and dexfenfluramine ("Redux"). Approximately six million people in the United States had taken one or both of the diet drugs prior to the withdrawal. Subsequent studies have linked ingestion of the diet drugs to valvular heart damage ("VHD"), including a condition known as heart-valve regurgitation (the reverse flow of blood through a closed heart valve). After the diet drugs were withdrawn, approximately 18,000 lawsuits were filed against Wyeth in state and federal courts nationwide. In December 1997, the Judicial Panel for Multidistrict Litigation ("JPML") consolidated the pending federal cases for coordinated pre-trial proceedings and transferred them as MDL-1203 to the docket of then District Judge Louis C. Bechtle in the United States District Court for the Eastern District of Pennsylvania.[2]

In November 1999, Wyeth and representatives of the state and federal court plaintiffs executed a Nationwide Class Action Settlement Agreement ("Settlement Agreement"). The proposed class included all persons in the United States, including their representatives and dependents, who had ingested either or both of the diet drugs. Judge Bechtle granted provisional approval to the Settlement Agreement and initiated a wide-reaching

---

[2] Judge Bechtle has since retired from his position as a federal judge.

7

notification program to alert all potential class members. The notice program had two essential parts:

> The first part of the notice program was designed to make class members aware of the potential risks posed by Pondimin and Redux, of the legal rights arising from the use of those drugs, of the proposed nationwide class action settlement which would resolve such claims and of their opportunity to opt out or object to the Settlement. In addition, the first part of the notice program was designed to inform class members of the opportunity to obtain a court authorized "notice package" describing their legal rights in relation to the settlement by registering to receive the notice package through a 1-800 number (1-800-386-2070) or through the world wide web (www.settlementdietdrugs.com). The second part of the notice program was to provide a detailed "notice package" to each person who had registered through the 1-800 number or web site and to all other class members whose names and addresses were known to the parties.

In re Diet Drugs, MDL No. 1203 & Civ. No. 99-20593, 2000 WL 1222042, at *35 (E.D. Pa. Aug. 28. 2000). From November 1999 through March 2000, the notice was disseminated to potential class members through a broad spectrum of media, including: a television commercial; magazines; local and national newspapers; publications targeting healthcare providers and pharmacists; banner advertisements on the Internet directing class members to the official settlement website; and a direct mailing to all doctors and pharmacists believed to have prescribed Pondimin or Redux.

After the notice program, Judge Bechtle conducted a comprehensive evidentiary hearing on fairness of the Settlement Agreement. He then formally certified the plaintiffs' class and approved the Settlement Agreement (with four amendments) on August 28, 2000. Judge Bechtle made numerous factual determinations in connection with his approval of the Settlement Agreement, two of which are relevant here. First, he found that the dissemination of notice to class members was "highly successful," explaining that

8

[a] sophisticated media analysis demonstrated that 97% of women between the ages of 25 and 54 viewed one or more forms of televised or printed notice an average of 10 times. A reach and frequency analysis indicated that almost 80% of women between the ages of 25 and 54 were exposed to the message contained in the televised or printed forms of notice a minimum of five times. Women between the ages of 25 and 54 account for a vast majority of the use of diet drugs Pondimin and Redux. . . . In addition, a reach and frequency analysis indicated that the settlement message reached 97% of women 35 years and older an average of 11.4 times and that it reached 81% of women 35 years and older a minimum of five times. With respect to African-American women between the ages of 25 and 54, the reach and frequency analysis shows that the settlement message reached 97% of those women an average of 10.2 times and that 79% of African-American women between the ages of 25 and 54 viewed the message a minimum of five times. With respect to men age 25 through 54, 94% viewed the settlement message an average of 6.2 times and 54.3% were reached with the settlement message a minimum of five times.

Id. at *36 n. 16. Second, Judge Bechtle found that the diet drugs do not cause latent injuries – a finding that was central to his determination of the adequacy of the class representation and his approval of the Settlement Agreement. Objectors to the Settlement Agreement had argued that a "futures" problem existed because issues regarding latency and the progression of VHD remained unsettled. Judge Bechtle rejected this argument, noting, inter alia,

The clinical and epidemiological studies demonstrate – and all the experts agree – that insofar as the use of fenfluramine or dexfenfluramine results in an increased prevalence of valvular regurgitation, that regurgitation is detectable by echocardiogram shortly after the patients discontinue use of diet drugs. Conversely, there is no evidence that the use of the drugs results in any increased risk of regurgitation that is "latent" and not detectable by

9

today's sophisticated echocardiographic technology.

Id. at *46. After appeals terminated, the Settlement Agreement received "Final Judicial Approval" on January 2, 2002.

By its terms, the Settlement Agreement offered class members a chance to opt out from seeking benefits under the agreement and, instead, to pursue remedies against Wyeth through the tort system. The 450 petitioners before us are class members who exercised the opt-out right and filed 127 separate suits in Texas state courts from November 2002 to August 2003.[3] Petitioners are known as "intermediate" opt-outs because they exercised the opt-out right after an initial deadline of March 30, 2000. To qualify for an intermediate opt-out, class members had to take an echocardiogram and have a qualified physician find a medically relevant severity of heart-valve regurgitation as defined by the Settlement Agreement. Intermediate opt-out plaintiffs are entitled to sue Wyeth for compensatory damages, but they have agreed not to seek punitive, exemplary, or multiple damages. In return for this restriction, Wyeth has agreed to waive any statute of limitations defense to the suits against it. The Houston, Texas, law firm of Fleming & Associates, LLP, is

---

[3]An additional 508 opt-out plaintiffs who had filed suits in Mississippi state courts initially joined in this mandamus request but have since withdrawn. We therefore address only the Texas petitioners' request for mandamus.

Notably, as of January 31, 2006, some 30,000 to 35,000 plaintiffs had approximately 14,000 cases pending before the District Court for the Eastern District of Pennsylvania as part of MDL-1203. The 450 petitioners before us obviously represent only a small fraction of that total number. However, counsel from numerous law firms representing thousands of opt-out plaintiffs have submitted briefs as amici curiae in support of petitioners' mandamus request. The amici make it clear that the question whether the District Court has erred in refusing to remand cases to state court is one that is common to a substantial number of the pending diet drug cases.

10

counsel to all of the petitioners before us.

In their complaints, petitioners named as defendants both Wyeth and the individual physicians who prescribed them the diet drugs.[4] Petitioners raised state-law claims against Wyeth based on negligence, design and marketing defects, and inadequate and improper warnings. They raised separate claims of medical malpractice against the physicians for failure to warn of the dangers of the diet drugs, failure to prescribe the drugs under proper conditions, and failure generally to provide reasonable treatment and proper care. Petitioners asserted no claims under federal law.

Wyeth timely removed petitioners' cases under 28 U.S.C. § 1441 to federal district courts in Texas, arguing that petitioners "fraudulently joined" the physicians solely as a means to defeat federal-court diversity jurisdiction. Petitioners and the physicians are citizens of Texas, while Wyeth is a Delaware corporation with its principal place of business in New Jersey. Absent the physicians, it is undisputed that complete diversity of citizenship exists for purposes of 28 U.S.C. § 1332 jurisdiction.[5]

The JPML eventually transferred all of petitioners' cases to the docket of MDL-1203. Petitioners moved for a remand to state court under 28 U.S.C. § 1447(c), arguing that the physicians were properly named, that the claims against the physicians are colorable under Texas law, and that complete diversity is therefore lacking. Wyeth argued that petitioners

_____

[4]The District Court noted that in some complaints petitioners also named "non-diverse sales representatives employed by Wyeth." Merits App. at 285. The parties did not include copies of these complaints in the voluminous appendices submitted to this court. In their mandamus petition, which argues that their cases belong in state court, petitioners focus exclusively upon their claims against the non-diverse physicians. We therefore do not address the claims that were apparently raised against Wyeth's sales representatives.

[5]The parties do not dispute that the amount in controversy requirement is satisfied. See § 1332(a).

11

fraudulently named the physicians because the claims against them are clearly time-barred under the Texas two-year statute of limitations that governs claims against health care providers. As such, it argued, the physicians should be dismissed, and the claims against Wyeth as the lone defendant should be heard in federal court.

Judge Bechtle was succeeded as the presiding District Judge over MDL-1203 by the Honorable Harvey Bartle III, currently Chief Judge of the United States District Court for the Eastern District of Pennsylvania ("the District Court"). In August, September, and October 2004, the District Court issued seven separate Pre-Trial Orders ("PTOs") (numbers 3870, 3871, 3991, 3995, 4017, 4036, and 4054) in which he denied petitioners' motions to remand and dismissed all defendants from the actions except Wyeth. Because the District Court had previously issued a lengthy unpublished opinion on a similar remand motion from Texas plaintiffs in an action titled Accadia v. Wyeth, PTO No. 3666 (E.D. Pa. June 29, 2004), the District Court adopted its analysis in Accadia to reject the petitioners' motions.

In Accadia, the District Court explained that although Wyeth had withdrawn Pondimin and Redux from the market in September 1997, the plaintiffs did not file suit in Texas until mid-2003, which was more than five years after their physicians last prescribed the diet drugs. The District Court observed that the test in a fraudulent joinder inquiry is not whether the plaintiff fails to state a claim against the non-diverse defendant but merely whether the claim is colorable. The District Court agreed with Wyeth that the claims against the physicians are not colorable because they are time-barred. The Court rejected the argument that plaintiffs were unable to discover their injuries until the echocardiogram results revealed their alleged heart problems because actual knowledge of the particulars supporting a cause of action (such as receipt of an examination result) is not required to commence a limitations period. In addition, the District Court rejected the contention that plaintiffs were unable to timely discover their injuries because they experienced no symptoms of heart problems or failed to attribute any symptoms

12

to the diet drugs. The Court agreed with Wyeth that the "extensive publicity" in Texas and nationwide that accompanied the September 15, 1997, withdrawal of the diet drugs put plaintiffs on notice of their injuries.[6] Moreover, even if the 1997

_____

[6]The District Court summarized portions of the publicity as follows:

> The publicity began on September 15, 1997. At 5:00 p.m., the Houston CBS news affiliate started the broadcast with a report that Wyeth's diet drugs had been pulled from the market, announcing that the Food and Drug Administration ("FDA") is urging millions of dieters to stop taking them as "[t]hey have been linked to serious heart problems. Similar newscasts kicked off the five o'clock news for both the ABC and NBC affiliate station in the Houston area. These news reports and the headline news in the papers the following day warned viewers and readers of the evidence indicating that the diet drugs could seriously damage the heart. The stories were also carried on Houston radio stations. They informed listeners that [the diet drugs] had been pulled from the market because of evidence linking the drugs to heart problems. Within a week, lawyers began running ads in the Houston Chronicle advising potential plaintiffs of the life-threatening problems that could result from the use of the diet drugs.

> The publicity in the Dallas/Fort Worth, San Antonio, Waco, and El Paso areas was just as pervasive. . . .

> . . . .

> Media coverage of the withdrawal of the diet drugs from the market was not limited to local news outlets. Reports about the withdrawal were the leading stories on major television network news programs, including NBC Nightly News, CBS Evening News and the Today Show. USA Today, a daily newspaper with a national readership, ran a front-page story regarding the withdrawal of diet

13

publicity was insufficient to provide notice, the District Court concluded that plaintiffs "certainly were put on notice by the end of March, 2000, by the comprehensive publicity campaign surrounding the nationwide class action Settlement Agreement with Wyeth." Motion App. at 387 (citation omitted).

The District Court rejected the contention that VHD can be latent. It noted that Judge Bechtle had found that diet-drug-related injury occurs at or near the end of the last use, with no latency period before the emergence of detectable injury. As class members and parties to the Settlement Agreement, plaintiffs were estopped from re-litigating the issue of latency. The District Court also rejected plaintiffs' reliance upon the Texas Constitution's "Open Courts" provision, which creates an exception to the state statute of limitations period if it would

---

drugs, [their] effects, and the response by various organizations throughout the United States regarding the news. The article went so far as to report that potential litigation was imminent and people who had taken diet drugs were signing up with attorneys to take part in a large class action lawsuit.

Wyeth also informed consumers about the recall of its diet drugs. Immediately after removing the drugs from the market on September 15, 1997, Wyeth issued a press release advising patients who had used diet drugs to consult their physicians. It included the same message in full page ads that it purchased in leading national and regional newspapers. These ads led with a banner in large print, stating "An Important Message To Patients Who Have Used Pondimin or Redux." Furthermore, Wyeth sent a "Dear Health Care Provider Letter" to approximately 450,000 physicians and pharmacists in which it informed them of the withdrawal of the drugs from the market and of the potential association between use of the drugs and instances of valvular heart disease.

Motion App. at 384-87.

14

have been "impossible or exceedingly difficult" timely to discover the alleged wrong. The District Court further found no tolling based on the physicians' alleged fraudulent concealment of the dangers of the diet drugs, noting that there was no evidence that the physicians knew plaintiffs were injured or willfully concealed diet-drug injuries to deceive plaintiffs. Finally, the District Court found no basis for tolling in the terms of the Settlement Agreement. In conclusion, the District Court explained in Accadia that

> [i]n light of the massive publicity concerning the health risks associated with the use of the diet drugs, the comprehensive notice program associated with the settlement, and this court's determination that diet drug induced valvular heart disease is not a latent disease, we find that plaintiffs, through the exercise of reasonable diligence, should have discovered their alleged injuries at the very latest by the end of March, 2000. Since plaintiffs did not file these actions until [more than two years later], their claims against their prescribing physicians are clearly time barred.

Motion App. at 394.

As noted, the District Court adopted its analysis in Accadia to reject petitioners' motions to remand their cases to state court. Petitioners then turned to this court by filing a petition and supplemental petition for a writ of mandamus.

## II.

By invoking our mandamus jurisdiction, petitioners concede, at least implicitly, that we have no appellate jurisdiction at this time to review the denial of their remand motions. In the ordinary course of proceedings, we acquire jurisdiction over a matter by way of an appeal either from

> final orders under 28 U.S.C. § 1291; collateral orders under the doctrine of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949); interlocutory orders

15

concerning injunctions under 28 U.S.C. § 1292(a); questions certified for appeal by the district court and then certified by the appellate court under 28 U.S.C. § 1292(b); or certification by the district court pursuant to Fed. R. Civ. P. 54(b) of a "final" judgment when disposition has been had of less than all parts or issues in a given case.

In re Diet Drugs, 401 F.3d at 154 (footnote omitted). Petitioners make no claim to the availability of review at this time through any of these avenues of appeal, nor could they reasonably do so. See, e.g., Caterpillar Inc. v. Lewis, 519 U.S. 61, 74 (1996) ("An order denying a motion to remand, standing alone, is obviously not final and immediately appealable as of right.") (citation, quotation marks and punctuation omitted); see also Spring Garden Associates, L.P. v. Resolution Trust Corp., 26 F.3d 412, 414 (3d Cir. 1994) ("As for the district court's denial of a remand, neither 28 U.S.C. § 1291 nor 28 U.S.C. § 1292 expressly confers jurisdiction on this court to review orders denying a remand to a state court.") (citations omitted).

It is well-recognized, however, that mandamus is not a mere alternative to an appeal. Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1422 (3d Cir. 1991). Instead, mandamus is properly viewed as a "safety valve in the final-judgment rule," In re Asbestos Sch. Litig., 46 F.3d 1284, 1295 (3d Cir. 1994), because it provides "a drastic remedy that a court should grant only in extraordinary circumstances in response to an act amounting to a judicial usurpation of power." In re Diet Drugs, 418 F.3d at 378 (quotation marks and citation omitted).

The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court has identified "three conditions" that must be met before a reviewing court may issue a writ of mandamus under § 1651(a) in aid of its jurisdiction: the petitioner must establish both that there is (1) "no other adequate

16

means" to attain the relief sought, and (2) a right to the writ that is "clear and indisputable;" and, (3) even if these first two conditions are met, the reviewing court in its discretion must conclude that the writ "is appropriate under the circumstances." Cheney v. U.S. Dist. Court for Dist. of Columbia, 542 U.S. 367, 380-81 (2004) (citations and quotation marks omitted).

A.

We first address whether petitioners have shown that there is no other adequate means to attain the desired relief. This requirement is intended "to ensure that the writ will not be used as a substitute for the regular appeals process." Cheney, 542 U.S. at 380-81 (citing Ex parte Fahey, 332 U.S. 258, 260 (1947)). An appellate court's overuse of the writ to review interlocutory district court decisions would undermine the Congressional policy against piecemeal appeals. As the Supreme Court has explained,

> [P]articularly in an era of excessively crowded lower court dockets, it is in the interest of the fair and prompt administration of justice to discourage piecemeal litigation. It has been Congress' determination since the Judiciary Act of 1789 that as a general rule appellate review should be postponed until after final judgment has been rendered by the trial court. A judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation would run the real risk of defeating the very policies sought to be furthered by that judgment of Congress.

Kerr v. U.S. Dist. Court for N. Dist. of Cal., 426 U.S. 394, 403 (1976) (footnote, punctuation, and citations omitted).

Based on these principles, we have recognized that a petitioner cannot claim the lack of other means to relief if an appeal taken in due course after entry of a final judgment would provide an adequate alternative to review by mandamus. See Hahnemann Univ. Hosp. v. Edgar, 74 F.3d 456, 461 (3d Cir. 1996) ("To be sure, appeal after final judgment constitutes 'other

means' of relief.").[7]  Indeed, the general rule in federal litigation is that "a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated."  Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868 (1994) (citation omitted).  A final judgment for purposes of 28 U.S.C. § 1291 is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  Catlin v. United States, 324 U.S. 229, 233 (1945) (citation omitted).

Petitioners have not shown that an appeal at the end of their cases would be inadequate.  Should petitioners' cases reach finality in the MDL-1203 proceedings before the District Court, the denial of their motions to remand can be reviewed in this court in conjunction with an appeal taken under § 1291.  E.g., Albright v. R. J. Reynolds Tobacco Co., 531 F.2d 132, 134 (3d Cir. 1976).  Of course, the JPML transferred petitioners' cases to MDL-1203, and thus the cases, unless "previously terminated" as part of the MDL-1203 proceedings, will be remanded at the

---

[7]We have also expressed a "preference for an explanation in the [mandamus] petition for why interlocutory appeal is not an adequate alternative.  Where interlocutory appeal seems a practical but untried avenue, we will ordinarily deny a petition for mandamus."  In re Sch. Asbestos Litig., 977 F.2d 764, 774 (3d Cir. 1992).  Petitioners contend that they did not seek certification for an interlocutory appeal because the District Court denied certification in other removed cases, and thus, they contend, another such request would have been futile.  On the record before us, it seems sufficiently clear that the District Court would have refused to certify an interlocutory appeal or enter a Rule 54(b) order, thus leaving such review an impractical avenue for petitioners to pursue.  Cf. In re Chimenti, 79 F.3d 534, 540 (6th Cir. 1996) ("Although the availability of permissive interlocutory appeal under § 1292(b) should normally militate against granting the writ, it is plain that any attempt to obtain certification in this case would have been futile. . . .  There was no apparent likelihood that the Chimentis would succeed in convincing the district court to certify a § 1292(b) appeal.").

conclusion of the coordinated pretrial proceedings to the transferor Texas federal district courts.  28 U.S.C. § 1407(a).  Consequently, should petitioners' cases reach finality in the Texas district courts, appeal would be to the Court of Appeals for the Fifth Circuit which has also held that review of a remand denial is available at the end of the case.  See B., Inc. v. Miller Brewing Co., 663 F.2d 545, 548 (5th Cir. 1981) ("Ordinarily, a district court's refusal to remand an action is not in and of itself a final order and cannot be reviewed unless and until a final judgment has been entered."); Boone v. Citigroup, Inc., 416 F.3d 382, 388 (5th Cir. 2005) (reviewing denial of remand motion on appeal from final judgment).  Indeed, as a matter of appellate jurisdiction, there appears to be no question that § 1291 review will be available to petitioners, and to diet drug plaintiffs generally, should they elect to raise the remand issue upon entry of a final judgment, regardless of the court of appeals that encompasses the district in which their cases reach finality.  See generally 19 James Wm. Moore et al., Moore's Federal Practice ¶ 202.11[5] (3d ed. 1997) ("An order denying a motion to remand a case to the state court from which it was removed . . . may be appealed together with the appeal of the final judgment.") (footnotes omitted).

Petitioners suggest that the availability of review at the end of their cases in the court of appeals for the transferor district is less than certain.  They fear that Wyeth might successfully challenge the authority of other courts of appeals to review the remand issue by arguing that this court has exclusive authority to review the rulings of an MDL court located within the Third Circuit.  Petitioners fail, however, to direct us to any authority to substantiate this concern.  To the contrary, at least one court of appeals has squarely recognized that an MDL Court's previously unreviewed rulings are properly raised in the court of appeals for the transferor district should the case reach a final judgment there.  See Allegheny Airlines, Inc. v. LeMay, 448 F.2d 1341, 1344 (7th Cir. 1971) (per curiam) (holding that MDL court's dismissal of third-party complaints would return as "part of the 'package'" to transferor district and dismissal as well as final judgment in primary action could be appealed to appropriate Court of Appeals).

19

Two leading treatises unequivocally express the same view. See 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3862 (2d ed. 1986) ("Of course, once a case has been remanded to the transferor district and a final judgment has been entered, any appeal may include objections to errors allegedly committed by the transferee judge.") (footnote omitted); 17 James Wm. Moore et al., Moore's Federal Practice ¶ 112.07[4] (3d ed. 1997) ("Once an action is remanded to the transferor district, it will be the court of appeals for the transferor district that will have appellate jurisdiction over any unreviewed matters. That court of appeals will have appellate jurisdiction over any unreviewed rulings made by the transferee court prior to transfer as well as rulings made by the transferor court subsequent to remand.") (footnotes omitted). We thus reject petitioners' jurisdictional concerns regarding the availability of review on a § 1291 appeal.

Petitioners alternatively contend that awaiting a final judgment provides an "illusory" remedy. Petitioners' Br. at 57. They claim that lengthy discovery and trial proceedings remain and that "wasted resources" will be the result if it is determined only after trial that federal jurisdiction was lacking in their cases. Id. at 58. Petitioners are assuming, of course, that their cases will not terminate in their favor, which is mere speculation. Nevertheless, we discern nothing extraordinary in their situation to justify intervention on the remand question via mandamus. It is the congressionally mandated norm in federal litigation to await final judgment. In these cases, following that procedure will not deprive a reviewing court of the ability to fashion a meaningful remedy for petitioners, such as a remand of their cases to state court. See, e.g., McKee v. Kansas City S. Ry. Co., 358 F.3d 329, 337 (5th Cir. 2004) (reversing denial of motion to remand, vacating jury verdict, and ordering remand given defendant's failure to establish fraudulent joinder). Moreover, like any plaintiff, these petitioners (or their counsel) must incur the expense inherent in pursuing litigation. We recognize that they also face the unavoidable prospect of adverse interlocutory rulings like those challenged here. Such rulings may well increase the cost of litigation, cause inconvenience, or result in unanticipated delay in prosecuting the case. But these added

20

burdens, or what petitioners deem "wasted resources," typically do not suffice to warrant the extraordinary step of mandamus intervention. See Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 30 (1943) (noting that "inconvenience is [something] which we must take it Congress contemplated in providing that only final judgments should be reviewable"); Commc'n Workers of Am. v. Am. Tel. & Tel. Co., 932 F.2d 199, 210 (3d Cir. 1991) ("[W]hatever the outcome of the litigation, the fact that [petitioner] must bear the inherent costs of litigation is not so consequential a harm that we would be justified in issuing a writ of mandamus to prevent further proceedings."); cf. In re Sch. Asbestos Litig., 46 F.3d 1284, 1295 (3d Cir. 1994) (issuing the writ because the harm in awaiting a final judgment went "well beyond the mere expense and inconvenience of litigation").

Nor can petitioners meaningfully contend that mandamus review of the remand issue is warranted because of the large number of cases that Wyeth has removed to federal court on the basis of fraudulent joinder. Petitioners argue that "it rises to the level of impracticability for the federal judiciary to confront thousands of appeals on this common issue at the end of the case." Oral Arg. Tr. at 12. We have previously rejected this very same argument:

> The petitioners' implied premise is that final appeal is a presumptively inadequate means of review in megalitigation. If we accepted that position, however, every significant interlocutory order in this case would arguably be subject to review on petition for mandamus. That would be an untenable result. Although the extraordinary size and complexity of a case may assist in creating the extraordinary circumstances necessary to invoke mandamus, they are not alone sufficient.

In re Sch. Asbestos Litig., 977 F.2d 764, 778 n. 14 (3d Cir. 1992); see also In re Diet Drugs, 418 F.3d at 379 (rejecting "the contention that the scope (or even the complexity) of a case, without more, is sufficient to warrant the issuance of the writ"). Thus, we conclude that an appeal after final judgment is not an illusory or ineffectual means through which petitioners can

21

pursue their arguments for a remand to state court.

Petitioners suggest that mandamus is appropriate because their situation is similar to that presented in In re Dutile, 935 F.2d 61 (5th Cir. 1991). In Dutile, plaintiffs sued in state court based on injuries sustained onboard a shipping vessel and sought relief under the federal Jones Act, general maritime law, and state law. Id. at 62. The district court denied a motion to remand after removal, denied plaintiffs' requests to dismiss their claims against the vessel, and refused to certify an interlocutory appeal. Id. Plaintiffs then sought a writ of mandamus, arguing that a remand was required because federal law prohibited removal of the Jones Act claim, and the maritime and state law claims were not otherwise removable. Id. The court of appeals observed that a defendant who seeks to remove a maritime action must establish diversity jurisdiction and, because complete diversity was lacking, the maritime claims were not properly removed; further, it observed that the Jones Act and state-law claims were not removable in their own right. Id. at 62-63. In light of the district court's clear error, the court issued the writ and ordered a remand. Id. at 63-64. The court added, however, that it was granting the extraordinary remedy of mandamus "for more than the trial court's legal error." Id. at 63. It noted that the Jones Act grants plaintiffs the "uncommon right" to choose state court as the forum for their suit without regard to the wishes of the defendants, and a failure to issue the writ would thwart that congressional policy. Id. at 63-64. Without mandamus relief, plaintiffs would be "trapped in a federal forum they did not choose on an explicitly non-removable claim," and thus awaiting an appeal after final judgment was not a viable alternative means to relief. Id. at 64.

The concerns at issue in Dutile are simply not present here. Petitioners did not bring suit on a claim "explicitly" determined by Congress to be "non-removable." Rather, they filed suit in state court solely under Texas law based on claims of negligence and strict liability. Consequently, and unlike the diverse defendant in Dutile, Wyeth could properly exercise the right to removal and seek to establish that the non-diverse defendants were "fraudulently joined."

22

By statute, a defendant has the right to remove a civil action from state court if the case could have been brought originally in federal court. 28 U.S.C. § 1441(a). For a removal predicated upon diversity of citizenship, a proper exercise of federal jurisdiction requires satisfaction of the amount in controversy requirement as well as complete diversity between the parties, that is, every plaintiff must be of diverse state citizenship from every defendant. See Grand Union Supermarkets of the Virgin Islands, Inc. v. H.E. Lockhart Mgmt., Inc., 316 F.3d 408, 410 (3d Cir. 2003).

The doctrine of fraudulent joinder represents an exception to the requirement that removal be predicated solely upon complete diversity. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998). In a suit with named defendants who are not of diverse citizenship from the plaintiff, the diverse defendant may still remove the action if it can establish that the non-diverse defendants were "fraudulently" named or joined solely to defeat diversity jurisdiction. As will be discussed more fully in Part B of this Opinion, this court has held that joinder is fraudulent if "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 32 (3d Cir. 1985) (citation and quotation marks omitted). If the district court determines that the joinder was "fraudulent" in this sense, the court can "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." Mayes v. Rapoport, 198 F.3d 457, 461 (4th Cir. 1999) (citation omitted). If, however, the district court determines that it does not have subject-matter jurisdiction over the removed action because the joinder was not fraudulent, it must remand to state court. 28 U.S.C. § 1447(c). If warranted, the district court's "order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Id.

Wyeth removed petitioners' cases, and the District Court

23

ruled on petitioners' motions to remand in accordance with these procedures. Whether the District Court erred in denying the motions to remand is an issue that petitioners can raise on appeal after entry of a final judgment in their individual cases. The United States Supreme Court has long rejected the general availability of mandamus "as a means of reviewing the action of a district court in denying a motion to remand a cause to the state court from which it had been removed." Roche, 319 U.S. at 30-31 (citing Ex parte Hoard, 105 U.S. 578 (1881); Ex parte Harding, 219 U.S. 363 (1911); Ex parte Roe, 234 U.S. 70 (1914); and Ex parte Park Square Auto. Station, 244 U.S. 412 (1917)) (footnote omitted). On the record before us, the District Court's order denying the motion to remand does not warrant a writ of mandamus. Requiring petitioners to seek review after a final judgment is in keeping with this entrenched line of Supreme Court precedent.

B.

Petitioners' mandamus request also fails the second condition for issuance of a writ of mandamus, as they have not shown a "clear and indisputable right" to the writ. We may issue the writ "only if the district court committed a 'clear error of law' at least approaching the magnitude of an unauthorized exercise of judicial power, or a failure to use that power when there is a duty to do so." In re Federal-Mogul Global, Inc., 300 F.3d 368, 384 (3d Cir. 2002) (punctuation omitted). When a mandamus petitioner challenges a district court's subject-matter jurisdiction, as is the case here, our issuance of the writ has traditionally been reserved to "restrain[ing] jurisdictional excesses, particularly when a lower court has acted without authority to do so." In re Sch. Asbestos Litig., 921 F.2d at 1314 (citation omitted). However, "mere doubt" about the district court's jurisdiction is never enough to justify mandamus relief. Id. Rather, "the district court's lack of subject matter jurisdiction [must be] 'clear and indisputable.'" Id.; see also Roche, 319 U.S. at 26 ("[A]ppellate courts are reluctant to interfere [by mandamus] with the decision of a lower court on jurisdictional questions which it was competent to decide and which are reviewable in the regular course of appeal.") (citation

24

omitted).

Petitioners claim that the District Court erred in its fraudulent joinder analysis because their claims against the non-diverse Texas physicians are colorable under state law and not clearly time-barred. Petitioners rely upon the three decisions of this court in which we have developed our fraudulent joinder jurisprudence: Batoff v. State Farm Ins. Co., 977 F.2d 848 (3d Cir. 1992); Boyer v. Snap-on Tools Corp., 913 F.2d 108 (3d Cir. 1990); and Abels, 770 F.2d 26. We will briefly review Batoff, Boyer, and Abels before addressing whether petitioners have established a "clear and indisputable" right to relief.

In Batoff, a Pennsylvania psychologist filed suit in state court against an automobile insurer as the assignee of a patient's right to payment for medical expenses. The plaintiff also named as a defendant another psychologist (a Pennsylvania resident), asserting that the psychologist engaged in a conspiracy with the insurer to prevent payment. After the insurer removed the action, the district court rejected the plaintiff's motion to remand for want of diversity jurisdiction. The district court held that the plaintiff had failed to state a claim on the merits against the non-diverse psychologist, and dismissal of that claim resulted in complete diversity between the plaintiff and the insurer. The district court subsequently also dismissed the claim against the insurer for failure to state a claim, and the plaintiff appealed from the final judgment.

This court vacated the judgment for lack of subject-matter jurisdiction. We reviewed the standards to be applied in a fraudulent joinder analysis and summarized those standards as follows:

> A district court must consider a number of settled precepts in ruling on a petition to remand a case to state court for lack of diversity jurisdiction. When a non-diverse party has been joined as a defendant, then in the absence of a substantial federal question the removing defendant may avoid remand only by demonstrating that the non-diverse party was fraudulently joined. But the

25

removing party carries a heavy burden of persuasion in making this showing. It is logical that it should have this burden, for removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand.

Joinder is fraudulent where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendants or seek a joint judgment. But, if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court. . . .

In evaluating the alleged fraud, the district court must focus on the plaintiff's complaint at the time the petition for removal was filed. In so ruling, the district court must assume as true all factual allegations of the complaint. It also must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff.

Batoff, 977 F.2d at 851-52 (punctuation and citations omitted).

Applying these standards, we rejected the district court's decision to conduct a merits determination in the context of a fraudulent joinder inquiry. We explained that because "it is possible that a party is not fraudulently joined, but that the claim against that party ultimately is dismissed for failure to state a claim upon which relief may be granted," the district court had "erred in converting its jurisdictional inquiry into a motion to dismiss." Id. at 852. Unless the claims against the non-diverse defendant could be deemed "wholly insubstantial and frivolous," which they were not, the joinder could not be considered fraudulent.

In Boyer, upon termination of a dealership agreement, a tool dealer brought suit asserting state-law claims against a tool

26

seller and two of the seller's employees. The tool seller (a diverse defendant) removed the matter, claiming that the employees (non-diverse from the plaintiff) were fraudulently joined as evidenced by, inter alia, the terms of a release in the parties' termination agreement. The district court denied plaintiff's motion to remand on the ground that the non-diverse defendants "would prevail in a motion for summary judgment for failure to state a cause of action by reason of the release in the termination agreement." Boyer, 913 F.2d at 110 (citation and quotation marks omitted). The district court later entered summary judgment for the tool seller, finding that the claim as to that defendant also failed under the terms of the release in the termination agreement. Id.

On appeal from the final judgment, this court held that it was improper to reach the merits of the otherwise colorable claims against the non-diverse employees. We observed that "this is not a case where the action against the individual defendants is defective as a matter of law" because state law provided a cause of action against an employee whose fraud and misrepresentations contributed to plaintiff's damages even if the actions were taken in the course of employment. Id. at 111 (citation omitted). Assuming a district court can "pierce the pleadings" to determine whether a plaintiff has asserted a colorable claim against the non-diverse defendant, "that inquiry is far different from the summary judgment type inquiry made by the district court here." Id. at 112. The district court, "in the guise of deciding whether the joinder was fraudulent, stepped from the threshold jurisdictional issue into a decision on the merits," and because the dispositive defense based on the release was raised by all three defendants, it was impermissible for the district court to reach the merits of that defense in deciding the fraudulent joinder question. Id. We concluded that "where there are colorable claims or defenses asserted against or by diverse and non-diverse defendants alike, the court may not find that the non-diverse parties were fraudulently joined based on its view of the merits of those claims or defenses." Id. at 113. Such a determination must be left to the state court.

Finally, in Abels, plaintiffs filed suit in state court against

27

their insurer to recover under a policy for the loss of their home. Plaintiffs also named as defendants ten "John Doe" employees of the insurer who were non-diverse from plaintiffs. This court held that the district court's refusal to remand was error. We explained that the presence of the Doe defendants could not be said to represent an attempt to defeat diversity jurisdiction. We stated that a court must first "ask whether, on the face of the complaint, there are sufficient allegations concerning [the Doe defendants'] identity and conduct to justify consideration of their citizenship," and, second, we must "look beyond the face of the complaint for indicia of fraudulent joinder." Abels, 770 F.2d at 29. Because the plaintiffs' complaint identified the Doe defendants with specificity and raised express claims against them, we found the allegations sufficient to defeat diversity jurisdiction. We then "look[ed] beyond" the allegations and found that, at least subjectively, the "[p]laintiffs' conduct . . . [was] consistent with an intention to actually proceed against at least some Doe defendants." Id. at 32. We were "somewhat more troubled" when looking at "the objective criteria that there be some reasonable basis in fact and some colorable legal ground supporting a claim against the Doe defendants." Id. Nevertheless, we determined that "enough recent authority" supported the plaintiffs' claim that a cause of action existed under state law, thereby precluding a finding that there was no colorable legal basis. Id. "To inquire any further into the legal merits would be inappropriate in [a] preliminary jurisdictional determination." Id. at 32-33.

Petitioners assert that the District Court committed a clear error of law because it misapplied the teachings of Batoff, Boyer, and Abels. We disagree. The District Court confined its inquiry to whether petitioners could make a colorable argument to overcome the physicians' statute of limitations defenses, and it held that petitioners fraudulently joined those defendants because there could be no debate that the claims against the physicians are time-barred as a matter of law. This inquiry was consistent with our admonition in Batoff that a district court must rule out any possibility that a state court would entertain the cause before holding that joinder of a non-diverse defendant was fraudulent. 977 F.2d at 851. If a district court can discern,

28

as a matter of law, that a cause of action is time-barred under state law, it follows that the cause fails to present even a colorable claim against the non-diverse defendant. See Russell Petroleum Corp. v. Environ Products, Inc., 333 F. Supp. 2d 1228, 1233 (M.D. Ala. 2004). Courts have thus recognized that a statute of limitations defense is properly considered in connection with a fraudulent joinder inquiry. See, e.g., LeBlang Motors, Ltd. v. Subaru of Am., Inc., 148 F.3d 680, 690 (7th Cir. 1998) ("If the time to bring the cause of action had expired, then the district court was correct in dismissing Wright and Knight as fraudulently joined.") (citation omitted).

Petitioners argue that the District Court ignored their pleading allegations and resolved disputed issues of fact and sensitive questions of state law in ruling on the statute of limitations issue. They allege that they were unaware of their diet-drug injuries because they relied upon their physicians for information and advice, their physicians failed to warn them about the dangers of the diet drugs, and, moreover, their physicians fraudulently concealed those dangers. Petitioners contend that the District Court's ruling should have been based solely upon these allegations, and that it erred by considering matters outside the pleadings in holding their claims time-barred.

In Abels we made it clear that a court can look to more than just the pleading allegations to identify indicia of fraudulent joinder. We echoed that proposition in Boyer, although we were careful to observe, as we did in Batoff, that a district court must not step "from the threshold jurisdictional issue into a decision on the merits." Boyer, 913 F.2d at 112; see also Batoff, 977 F.2d at 852.

We have not previously had occasion to address the extent to which a court may look beyond the pleadings in a fraudulent joinder inquiry when faced with a statute of limitations defense to claims against non-diverse defendants. Certainly, a district court must accept any well-pleaded allegations as true, and resolve uncertainty in the law governing the limitations bar in plaintiff's favor. Cf. Batoff, 977 F.2d at 852. But in reviewing a limitations question, we see no reason

29

to preclude a district court from a limited consideration of reliable evidence that the defendant may proffer to support the removal. Such evidence may be found in the record from prior proceedings, which firmly establishes the accrual date for the plaintiff's claim, or in other relevant matters that are properly subject to judicial notice. Such a limited look outside the pleadings does not risk crossing the line between a proper threshold jurisdictional inquiry and an improper decision on the merits. After all, a statute of limitations defense is not a merits-based defense to the plaintiff's case. As one court has aptly observed,

> No doubt the statute of limitations is a defense, and a rather unique one at that. It is one that does not truly go to the merits of the plaintiff's claim in any sense. It does not assert some excuse or justification for what the defendant is alleged to have done, nor does it assert any release or waiver of any right of action against the defendant. It does not even deny the wrong or claim contributory fault or set off. Rather, it virtually admits the validity of the cause of action and the plaintiff's right to collect upon it, but asserts that the plaintiff waited too long to pursue the cause of action.

Ritchey v. Upjohn Drug Co., 139 F.3d 1313, 1319 (9th Cir. 1998).

Under Texas law, which governs the limitations question raised here, the Texas Supreme Court has similarly observed that "[o]f course, no statute of limitations directly addresses the merits of a claim to which it is interposed as a bar. Instead, limitations rest on a legislative policy judgment that requires the diligent pursuit of one's legal rights at the risk of losing them if they are not timely asserted." City of Murphy v. City of Parker, 932 S.W.2d 479, 481-82 (Tex. 1996) (citation omitted).

The policy judgment that stale claims should not see the light of day, when viewed in combination with a defendant's statutory right to remove an action that falls within the original jurisdiction of a federal court, counsels against confining a

30

district court strictly to the pleading allegations when it assesses a fraudulent joinder/statute of limitations question. A limited look beyond the pleadings, as described above, runs no risk of usurping jurisdiction over cases that properly belong in state court. To hold otherwise would run the risk that we condone the practice of asserting baseless, stale claims against non-diverse defendants for the sole purpose of thwarting a defendant's right to remove a case that falls within the original jurisdiction of a federal court.[8]

In Ritchey, the Ninth Circuit found that it was "reasonable and necessary" for a diverse defendant to present facts outside the pleadings to establish that joinder of the non-diverse defendants was fraudulent. 139 F.3d at 1318. Like the present case, the fraudulent joinder in Ritchey was based upon an assertion of a limitations bar under state law as to the claims against non-diverse defendants. Id. The court of appeals endorsed a look beyond the pleading allegations and took judicial notice of its prior decision in which it had affirmed factual determinations that effectively established the date on which the plaintiff's latest cause of action could be deemed to have accrued. Id. at 1319-20. On the basis of its prior decision, the court was able to conclude that "[t]he harm was well known to [the plaintiff] several years before he brought his action, and he also knew what wrongdoing had caused that harm." Id. at 1320. The court thus found it "pellucid" that plaintiff filed suit on his new theory after the limitations period had expired, and that the non-diverse parties were clearly "sham defendants for

_____

[8] Petitioners' suggestion that a statute of limitations defense is similar to the defense at issue in Boyer is unavailing. In Boyer, the defense asserted was based on the terms of a release in the parties' termination agreement and went directly to the merits of the plaintiff's cause of action. See Boyer, 913 F.2d 108. As such, it was improper for the district court to reach the merits of that defense as part of its fraudulent joinder inquiry. Moreover, unlike Boyer, the present situation is not a common-defense case where the asserted defense is shared by the diverse and non-diverse defendants alike.

31

purposes of removal." Id.

The District Court here looked beyond the pleadings in much the same manner. To determine if petitioners' claims accrued more than two years before they filed suit, the District Court considered the media-generated publicity that accompanied withdrawal of the diet drugs from the market on September 15, 1997. It also looked to the extensive and "highly successful" notification campaign that preceded Judge Bechtle's approval of the Settlement Agreement on August 28, 2000. Finally, the District Court looked to Judge Bechtle's prior factual determination that the diet drugs do not cause latent injuries. The District Court looked, in other words, to evidence that was established in prior proceedings in the MDL-1203 litigation (i.e., the no-latency determination and the success of the notification campaign), and to facts subject to judicial notice (i.e., the readily ascertainable sources that publicized withdrawal of the diet drugs).[9] Applying Texas law, the District Court determined that the limitations period on the claims against the physicians clearly began to run either when the diet drugs were withdrawn from the market on September 15, 1997, or, at the latest, at the end of March 2000 when the class-member notification campaign concluded.

Petitioners have not shown that the District Court's disposition of this issue warrants mandamus. Under Texas law,

---

[9]See Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 n. 3 (3d Cir. 2000) ("Under Federal Rule of Evidence 201, [a court] may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned.") (citation omitted); see also Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 n. 15 (3d Cir. 2006) (holding that district court did not err in taking judicial notice of newspaper articles because "[t]hey serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (citation omitted).

"the commencement of the limitations period may be determined as a matter of law if reasonable minds could not differ about the conclusion to be drawn from the facts in the record." Childs v. Haussecker, 974 S.W.2d 31, 44 (Tex. 1998) (citation omitted). The statute of limitations applicable to petitioners' claims against the physicians provided in relevant part as follows:

> Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed.

Tex. Rev. Civ. Stat. art. 4590i, § 10.01 (repealed 2003).[10]

The Texas Supreme Court has "repeatedly held that section 10.01 establishes an absolute two-year statute of limitations for health care liability claims." Diaz v. Westphal,

---

[10] This version of the statute of limitations, which the District Court applied to petitioners' claims, was repealed by the Texas Legislature effective September 1, 2003. See Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 864, 884; Murphy v. Russell, 167 S.W.2d 835, 836 n.1 (Tex. 2005). The current version of the health care liability statute of limitations is codified at Tex. Civ. Prac. & Rem. Code Ann. § 74.251 (Vernon 2005). Significantly, suits filed before the effective date of the new act are subject to the prior law. Yancy v. United Surgical Partners Intern., Inc., 170 S.W.3d 185, 189 n. 1 (Tex. App. 2005). Because the petitioners before us all filed suit before the effective date of the new law, the District Court properly applied § 10.01 to their claims. We note, in any event, that the language of the new statute does not differ in any respect that would be material to an assessment of when the limitations period began to run on petitioners' claims against the physicians. Id.; see Adams v. Gottwald, 179 S.W.3d 101, 103 (Tex. App. 2005) (observing that "section 74.251 is virtually identical to its predecessor, section 10.01").

33

941 S.W.2d 96, 99 (Tex. 1997). Consequently, there is no "discovery rule" in setting the date when the time limit on a claim begins to run under § 10.01. Morrison v. Chan, 699 S.W.2d 205, 208 (Tex. 1985) (citation and quotation marks omitted). In other words, the statute of limitations does not begin when the plaintiff discovered or reasonably should have discovered the injury. Id. Rather, one of three dates is used to set commencement of the limitations period: (1) "the date of the tort;" (2) "the last date of the relevant course of treatment;" or (3) "the last date of the relevant hospitalization." Husain v. Khatib, 964 S.W.2d 918, 919 (Tex. 1998). A plaintiff cannot choose the most favorable of these dates; if the specific date of the tort can be ascertained, the limitations period commences on that date. Earle v. Ratliff, 998 S.W.2d 882, 886 (Tex. 1999).

On September 15, 1997, the diet drugs were withdrawn from the market and no longer available for prescription. That date is, therefore, the last possible date on which any of the physicians could have prescribed Wyeth's diet drugs, and petitioners make no allegation to the contrary. The District Court could reasonably conclude that Texas law clearly mandates that petitioners' time for filing suit on a claim that the physicians committed malpractice in prescribing the diet drugs and in failing to warn of the risks of taking the diet drugs began to run on or before September 15, 1997. See Gross v. Kahanek, 3 S.W.3d 518, 521 (Tex. 1999) (holding that statute of limitations began to run when doctor last prescribed drug as part of "course of treatment" that allegedly caused patient's death). Petitioners filed the first of their suits against the physicians in November, 2002, more than five years later.

The District Court further concluded that, even if petitioners lacked sufficient awareness of their claims notwithstanding the publicity that surrounded withdrawal of the diet drugs, they were on notice at the end of March 2000 by virtue of the media campaign that preceded approval of the Settlement Agreement. Petitioners argue that the effectiveness of the notice campaign in reaching each individual class member is an issue that must be determined by a fact-finder on a case-by-case basis. As noted, after an extensive evidentiary hearing on

34

fairness, Judge Bechtle found that the program implemented to notify class members was "highly successful," a determination that was based on the compelling statistical evidence of success set forth at length in Part I of this Opinion. Judge Bechtle's approval of the Settlement Agreement depended in meaningful part on the effectiveness of the notice program, as proper notice was a prerequisite to the holdings that the court had obtained personal jurisdiction over absentee class members and that the requirements of due process and Federal Rules of Civil Procedure 23(c)(2) and 23(e) had been satisfied. Petitioners, for their part, do nothing more than assert that the effectiveness of the notice campaign must now be decided as a factual matter in each individual case, but they base that assertion solely upon a bald allegation that they were all unaware of potential diet-drug claims against their doctors in March 2000. The notice campaign's effectiveness was previously litigated before Judge Bechtle, and, as class members, petitioners were party to those proceedings, which received Final Judicial Approval. The notice campaign was expressly designed "to make class members aware of the potential risks posed by Pondimin and Redux, of the legal rights arising from the use of those drugs, of the proposed nationwide class action settlement which would resolve such claims and of their opportunity to opt out or object to the Settlement." In re Diet Drugs, 2000 WL 1222042, at *35. On this record, we cannot conclude that the District Court committed a clear error of law, or engaged in an unauthorized use of its power, in estopping petitioners' effort to re-litigate these issues to overcome the limitations bar.

In similar fashion, petitioners allege that their diet-drug injuries remained "latent" and were only discovered after echocardiograms were taken, at which time they first became aware of their potential claims against the physicians. Judge Bechtle squarely held, however, that Pondimin and Redux do not cause latent injuries; rather, any injury was detectable by echocardiogram upon or shortly after last use of the diet drugs, which were pulled from the market on September 15, 1997. This "no latency" determination was made after a full and fair evidentiary hearing and was an essential finding to support approval of the Settlement Agreement, as it bore directly on the

35

adequacy of the class representation. Class counsel had the opportunity but did not object to this finding at the fairness hearing. As to the individuals who did object, Judge Bechtle found that they "presented no evidence from any study to support the contrary view that [VHD] is either latent or that it progresses in most former patients." In re Diet Drugs, 2000 WL 1222042, at *47. Judge Bechtle fully considered, but rejected, the studies relied upon by the objectors and concluded that there was no support for a latency determination.

Petitioners respond that the latency issue is once again under debate before the District Court because certain class members have submitted affidavits from two doctors who claim that diet-drug-induced VHD can be latent. Petitioners argue that "[i]n the face of such scientific disagreement the district court's disregard of Plaintiffs' allegations in a fraudulent joinder inquiry was improper." Petitioners' Br. at 32-33. To the extent that petitioners claim that they now have *new* evidence regarding latency, we fail to see how that evidence would suffice to show clear error in the District Court's fraudulent joinder analysis

Similarly, we cannot conclude that petitioners have shown a "clear and indisputable right" to the writ based on the tolling afforded under the Texas Constitution's "Open Courts" provision.[11] This provision creates an exception to the two-year statute of limitations under § 10.01 in situations where the plaintiff had no "reasonable opportunity to discover the alleged wrong and bring suit before the limitations period expired." Shah v. Moss, 67 S.W.3d 836, 842 (Tex. 2001) (citations omitted); see Boyd v. Kallam, 152 S.W.3d 670, 676 (Tex. App. 2004). The extensive publicity and notice campaigns provide adequate support, at least for purposes of this mandamus proceeding, for the District Court's finding that petitioners had the requisite "reasonable opportunity" to discover their doctors'

_____

[11]Article I, Section 13 of the Texas Constitution provides in relevant part, "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."

alleged torts. Moreover, it was not clearly erroneous for the District Court to conclude that if the petitioners had acted with reasonable diligence, they could have learned more than two years before filing suit that the diet drugs were linked to heart-valve injuries. Those injuries manifested promptly and were readily detectable by echocardiogram. For purposes of our ruling on mandamus, we have no basis to disagree with the District Court's conclusion that petitioners clearly do not come within the "no reasonable opportunity" exception to the Texas statute of limitations.

Petitioners also argue that the limitations period can be tolled based on the physicians' alleged "fraudulent concealment," which is a "defense or plea in avoidance to the running of [the limitations period]" under Texas law. Estate of Fawcett, 55 S.W.3d 214, 218 n. 2 (Tex. App. 2001). Under Texas law,

> [F]raudulent concealment in medical negligence cases estops a health-care provider from relying on limitations to bar a plaintiff's claim. The plaintiff must show the health-care provider actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong from the patient. Fraudulent concealment tolls limitations until the plaintiff discovers the fraud or could have discovered the fraud with reasonable diligence.

Gilbert v. Bartel, 144 S.W.3d 136, 144 (Tex. App. 2004) (footnotes omitted). Petitioners alleged in their complaints that the physicians fraudulently concealed the dangers of Pondimin and Redux.[12] Petitioners do not allege, however, that the

---

[12]The parties have not made all 450 of petitioners' complaints part of the record in this proceeding, but the "Master Petition" filed by petitioners' counsel indicates that petitioners all made the same allegation regarding fraudulent concealment. See Respondent's App. at 2573 ("[T]he statute of limitations is tolled as to [plaintiffs'] claims against the defendant physician(s) as a result of his/her fraudulent concealment of the dangers of Pondimin

physicians "actually knew" that they were injured by the diet drugs and concealed that fact from them, or that the physicians ever willfully concealed the dangers of the diet drugs; petitioners allege only that the physicians were negligent in their failure to exercise ordinary care.

As the Texas Supreme Court has explained, "fraudulent concealment requires more than evidence that the physician failed to use ordinary care; it also requires evidence that the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff." Earle, 998 S.W.2d at 888. Given petitioners' allegations, we see no clear error or usurpation of authority in the District Court's failure to find a colorable basis for fraudulent-concealment tolling.

Petitioners raise two additional tolling arguments that warrant consideration. First, they claim that the Settlement Agreement precludes Wyeth from arguing a limitations defense on behalf of the physicians. By its terms, the Settlement Agreement bars petitioners from suing Wyeth for certain types of damages, and in return for that restriction Wyeth "shall not assert *any* defense based on *any* statute of limitations or repose." Motion App. at 690 (emphasis added). Petitioners interpret this provision as prohibiting Wyeth from relying on a physician's limitations defense as the ground for removal. Petitioners contend, in other words, that the word "any" in the above-quoted language should be interpreted to have a broad enough meaning to cover "any" limitations defense for "any" party named as a defendant, including a limitations defense specific to the claims against the physicians. The Settlement Agreement, however, does not prohibit Wyeth from removing petitioners' cases to federal court and asserting fraudulent joinder on the ground that

---

and Redux and/or the defendant physician(s) should be estopped from asserting the affirmative defense of limitations because as a fiduciary to Plaintiff(s) and the treating physician, the defen[da]nt physician(s) had duty to warn him of the dangers of Pondimin and Redux and Plaintiff(s) relied on his advi[c]e, or lack thereof, to his/her detriment.").

the claims against the non-diverse physicians are time-barred. Moreover, while petitioners also claim that the limitations defense is personal to the physicians and cannot be asserted by Wyeth, we cannot conclude that it was a clear error for the District Court to consider the defense as part of its inquiry into whether petitioners were thwarting diversity jurisdiction by joining defendants against whom they have no colorable claim. The presence of a clear limitations bar is one way to identify a fraudulent joinder, and consideration of the limitations defense enabled the District Court to assure itself that it could properly exercise diversity jurisdiction.

Second, petitioners contend that the injunction Judge Bechtle entered to preclude suits against Wyeth and others tolled the limitations period for claims against the physicians. They cite Hughes v. Mahaney & Higgins, 821 S.W.2d 154 (Tex. 1991), for the proposition that "[w]here 'a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the time during which he is thus prevented should not be counted against him in determining whether limitations have barred his right.'" Id. at 157 (quoting Walker v. Hanes, 570 S.W.2d 534, 540 (Tex. App. 1978)) (citations omitted).

In approving the Settlement Agreement on August 28, 2000, Judge Bechtle entered an order that class members who did not "timely and properly" exercise an opt-out right were enjoined "from asserting, and/or continuing to prosecute against [Wyeth] or any other Released Party any and all Settled Claims which the class member had, has or may have in the future in any federal, state or territorial court." In re Diet Drugs, 2000 WL 1222042, at *71. A "timely" intermediate opt-out right was determined based on the taking of an echocardiogram between September 30, 1999, and January 3, 2003, with a requirement that the right to opt out be exercised no later May 3, 2003. Petitioners argue that in view of these deadlines, "they were *entitled* to wait until May 3, 2003 to opt out, and until May 3, 2004 to file suit." Petitioners' Br. at 51 (emphasis added). As Wyeth correctly notes, however, petitioners were at liberty to free themselves from the terms of the injunction against suit simply by obtaining an echocardiogram anytime during the

39

relevant period beginning on September 30, 1999. As to the matter of tolling, therefore, petitioners have not clearly established that they were "prevented" from discovering their claims, exercising the opt-out right, and filing suit against their physicians. Because the injunction did not bar suit against a physician if the plaintiff timely and properly exercised an intermediate opt-out right, we cannot conclude that the District Court committed a clear error in failing to afford tolling on this ground.

Petitioners raise additional arguments, some for the first time in this mandamus proceeding, regarding the District Court's ruling on the fraudulent joinder issue. We find those remaining arguments insufficient and in need of no separate discussion. We conclude that petitioners have not shown a clear and indisputable lack of diversity jurisdiction over their actions, or that the District Court's refusal to remand amounts to a clear error of law. We emphasize that our holding in this matter is not intended to prejudice a later reviewing court in its consideration of petitioners' arguments for remand should petitioners elect to appeal on that issue after entry of a final judgment. We have merely reviewed the fraudulent joinder question for purposes of adjudicating petitioners' request for an extraordinary writ, and we conclude in that regard that petitioners lack a clear and indisputable right to relief.

## III.

Having considered petitioners' arguments, we hold that they fail to meet the first two conditions to mandamus relief. Accordingly, we will deny the petition for a writ of mandamus.

_____