HATFIELD TOWNSHIP, Montgomery
County, Pennsylvania

v.

LEXON INSURANCE COMPANY,
Appellant.

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2010.
Decided Feb. 23, 2011.

Sandhya M. Feltes, Blue Bell, for appellant.

David J. Sander, Jenkintown, for appellee.

BEFORE: LEAVITT, Judge, and BROBSON, Judge, and BUTLER, Judge.

OPINION BY Judge BROBSON.

Appellant Lexon Insurance Company (Lexon) appeals from an order of the Court of Common Pleas of Montgomery County (trial court). The trial court granted, in part, Hatfield Township's (Township) petition for a preliminary injunction, directing Lexon to pay the Township monetary proceeds from a surety bond. The surety bond was posted by T.H. Properties, L.P. (Developer) and issued by Lexon in accordance with a land development agreement between the Township and Developer.

The Township initiated this action by filing a complaint against Lexon on June

9, 2010. The Township averred that it entered into a land development and construction escrow agreement with Developer in December 2006, relating to Developer's plan to develop a residential subdivision called Westport Farms. The agreement required Developer to provide the Township with financial security in the form of a surety bond to secure completion of the public improvements in the development. Developer provided the Township with Surety Bond No. 1018386 (the Bond), issued by Lexon on September 14, 2006, identifying Developer as principal, Lexon as surety, and the Township as Obligee. (Reproduced Record (R.R.) at 63a–67a.)

Developer filed for bankruptcy under Chapter 11 in April 2009. (R.R. at 77a.) On May 18, 2009, the Township, in compliance with the terms of the Bond, sent a letter (Default Notice) to Developer (with a copy to Lexon), informing Developer that Developer was in default of the land development agreement and that Developer had twenty days to respond with some indication that it would move forward with completion of certain public improvements. (R.R. at 82a.) On June 2, 2009, the bankruptcy court issued an order directing, in part, that any claim by the Township against the Bond be stayed for sixty (60) days. (R.R. at 86a.)

The Township received a June 3, 2009 letter from Lexon, requesting information regarding the Township's claim (R.R. at 92a). The Township responded to Lexon's letter on June 22, 2009, providing the information Lexon requested. (R.R. 95a.) On July 30, 2009, the bankruptcy court extended the stay for an additional forty-five (45) days. (R.R. at 100a.) A letter dated August 11, 2009, from Lexon's counsel to the Township, indicated that Developer might be able to complete the public improvements before the expiration of the stay. (R.R. at 107a.) The Township submitted a punch list of outstanding public improvement work to Lexon's counsel on August 18, 2009. (R.R. at 110a.) The Township also advised Lexon it intended to pursue its claim under the Bond when the bankruptcy court lifted the stay.

The Township sent a letter to Developer (with copies to Lexon and its counsel) on September 19, 2009, advising that the federal bankruptcy court had lifted the stay, and that the twenty-day period identified in the Township's May default letter expired on September 19, 2009. (R.R. at 125a.) The Township sent a letter to Lexon on September 21, 2009, which the Township describes as a demand of payment, indicating that the Township intended to "open a claim on the Bond." (R.R. at 132a; Complaint ¶ 20.) Lexon's counsel informed the Township, by letter dated September 23, 2009, that Developer was still reviewing the matter. (R.R. at 11a, 146a; Complaint ¶ 21.)

Lexon responded to the payment demand by letter dated November 12, 2009, informing the Township that Lexon and a contractor would investigate and inspect the site with Developer. (R.R. at 139a.) The contractor inspected the site on December 1, 2009. (R.R. at 11a; Complaint ¶ 23.) Later, counsel for Lexon advised the Township that Lexon would approve for payment most of the items on the punch list; however, the only item Lexon has paid for is road winterization, which totaled $9,925. (R.R. at 11a; Complaint ¶ 24.) On April 28, 2010, Lexon denied payment for 16 of 18 items listed on the punch list, and refused to discuss payment for the other two items until Lexon received estimates for the cost of work on those two items. (R.R. at 142a.) The Township sent a second demand letter to Lexon on April 30, 2010 (R.R. at 149a), but Lexon and its counsel refused or failed to

pay the remaining amount of the Bond to the Township. (R.R. at 12a; Complaint ¶ 28.)

The Township's Complaint against Lexon sought (1) a declaratory judgment that Lexon is obligated by the Bond to pay the Township the remaining principal amount of $1,269,772, plus interest from September 19, 2009, costs, attorneys' fees, and punitive damages; and (2) a permanent injunction seeking payment of the Bond principal.

In its Complaint, the Township averred that the Township Engineer had inspected and observed 140 linear feet of trench settlement above the sanitary sewer along Grayson Drive in the development and additional trench settlement at numerous locations throughout the development. (R.R. at 13a; Complaint ¶ 35.) The Township Engineer recommended taking immediate action to determine the cause of the trenches and to make repairs in order to restore the streets to a safe condition. (Id.) Further, the Township Engineer believed that the condition would become more "critical" with the passing of time. (Id.)

The Township also averred that the Township Engineer issued a revised punch list on June 2, 2010, describing outstanding work that needed to be completed in conjunction with the dedication of the Development. (R.R. at 14a; Complaint ¶ 36.) The June 2010 punch list reflected improvements described as curb replacements, curb driveway depressions, sidewalk replacements, driveway apron replacements, handicap ramp replacements, bituminous trail, grading/stabilization, removal of erosion controls/staging area, cleaning of storm structures, storm sewer repairs, roadway repairs, leveling/scratch course, dewinterization, clean and tack coat, final paving, concrete replacements, public street signs, plumb/secure signs,

placement of street lights, repair of drainage structures, concrete channels, placement of steps, replacement of C-tops, replacement of inlet grates, rest MH Top, Reset Inlet Top, flush storm system, Basin No. 1 conversion, Basin No. 2 conversion, Basin No. 3 completion, bioretention swales 1–3, grade at endwall 13, repair easement settlement, repair inlet settlement, removal/grade/stabilize Open Space E, and mow/restore Open Space. (R.R. at 170a–72a; Complaint, Exhibit V (Estimated Cost Schedule for Completion of Punch List Items Revised June 2, 2010).)

The Township filed a petition for preliminary injunction the same day it filed its Complaint. The petition avers essentially the same facts as those in its Complaint, citing the same problems with roadway trenches and items Developer either had not begun to perform, had not completed, or had constructed improperly as identified in the June 2010 punch list. (R.R. at 183a–84a; Petition ¶¶ 28–9; Exhibit V.)

On June 17, 2010, the trial court held a hearing on the preliminary injunction petition. The trial court issued an order on June 25, 2010, granting the Township's petition, in part, and directing Lexon to pay the Township $521,538 immediately for construction work that the trial court determined to be necessary to address health and safety issues in the development. The trial court approved payment for a variety of items identified on the punch list, including curb replacements, curb driveway depression, driveway apron replacements, handicap ramp replacements, removal of erosion controls/staging area, roadway repairs, leveling/scratch course, dewinterization, clean and tack coat, final paving, placement of street signs, placement of street lights, repair of drainage structures, placement of steps, replacement of C–Tops, replacement of inlet grates, reset of MH Top, reset of inlet

top, basins Nos. 1–3 conversion, bioretention swales 1–3, repair easement settlement, repair inlet settlement, Open Space B (remove, fill, and stabilize), and mow and restore Open Space.

In its 1925(a)[1] Opinion, following Lexon's appeal to this Court, the trial court concluded that the Township had demonstrated an immediate threat to the health and safety of persons residing in and/or travelling through the development, and that the preliminary injunction was necessary to restore the status quo.

On appeal, Lexon identifies nine issues in its brief, which we summarize as follows:

1. Whether the Township satisfied its burden to establish the necessary criteria for the grant of a preliminary injunction, including: (a) irreparable harm; (b) no adequate remedy at law; (c) a clear right to relief; and (d) maintenance of the status quo?

2. Whether the Township satisfied the heavy burden to demonstrate its entitlement to mandatory preliminary injunctive relief?

3. Whether the trial court erred in concluding that the statute of limitations for bond claims found at 42 Pa.C.S. § 5523 does not apply?

### Standard of Review

■ In analyzing appeals from a trial court's granting of mandatory preliminary injunctive relief, the role of an appellate court does not permit an inquiry into the merits of the controversy. Rather, the courts should "examine the record to determine if there were any apparently rea-

sonable grounds for the action of the court." *Big Bass Lake Cmty. Ass'n v. Warren*, 950 A.2d 1137, 1144 (Pa.Cmwlth. 2008) (quoting *Roberts v. Bd. of Dir. of the Sch. Dist. of the City of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975)). The only circumstances warranting a reversal of a trial court's decision granting or denying a preliminary injunction are when it is clear "that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied." *Mazzie v. Com.*, 495 Pa. 128, 133, 432 A.2d 985, 988 (1981).

### Standard for Granting Injunctive Relief

■ An applicant seeking mandatory injunctive relief must establish the following: (1) irreparable harm will occur that is not compensable by money damages; (2) greater injury will result from the denial of the injunction than by granting the injunction; (3) the injunction will restore the status quo between the parties; and (4) the party seeking relief has a clear right to relief in an actionable claim.[2]

Further, in considering a request for *mandatory* injunctive relief as in this case, this Court in *Big Bass Lake Community* observed that "[a]lthough every injunction is extraordinary, the injunction that commands the performance of an affirmative act, a mandatory injunction, is the rarest, described as an 'extreme' remedy. . . . The case for a mandatory injunction must be made by a very strong showing, one stronger than that required for a restraining-type injunction." *Id.*, 950 A.2d at 1145 (citations omitted).

#### a. Irreparable Harm

■ Lexon first argues that the Township has not established that it will be

1. Pa. R.A.P. 1925(a).

2. *Woods at Wayne Homeowners Ass'n v. Gambone Constr. Co., Inc.*, 893 A.2d 196, 204 (Pa.Cmwlth.) (*Wayne Homeowners* ), *appeal denied,* 588 Pa. 767, 903 A.2d 1235 (2006).

irreparably harmed because any injury the Township sustains can be remedied through the payment of money damages. Lexon also argues that the harm the Township has alleged is speculative.

■ Injunctive relief will lie where there is no adequate remedy at law. *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 259, 602 A.2d 1277, 1286 (1992). In essence, Lexon contends that the Township must complete the improvements and then seek reimbursement for the costs of the improvements through a breach of contract action. Lexon argues that because the Township has available to it a breach of contract action with the prospect of a judgment for monetary damages, the trial court was barred from exercising equity jurisdiction.

We do not believe that Lexon's proposed, alternative legal remedy is adequate or complete, and, thus, we reject Lexon's claim that the Township has not established irreparable harm. Our conclusion is premised on the provision of the Pennsylvania Municipalities Planning Code (MPC)[3] that applies in cases, like this one, where a municipality has required a developer to post a bond or other security to ensure the completion of necessary public improvements. Section 511 of the MPC[4] provides, in pertinent part:

In the event that any improvements which may be required have not been installed as provided in the subdivision and land development ordinance or in accord with the approved final plat the governing body of the municipality is hereby granted the power to enforce any corporate bond, or other security *by appropriate legal and equitable remedies.*

(Emphasis added.) Lexon fails to address Section 511 in its arguments to the Court.

The statutory language, nonetheless, is clear and unambiguous. Adhering to this provision of the MPC, we do not accept Lexon's premise that a municipality in the Township's situation *must* choose to damage itself—*i.e.,* pay for the completion of public improvements—before it may sue to recover bond proceeds securing a developer's obligation to complete the public improvements. Instead, the General Assembly has expressly authorized municipalities to recover monetary proceeds from a bond by pursuit of legal *and* equitable remedies. In so doing, the General Assembly has made a policy decision that taxpayers should not be forced to front the cost of the improvements *before* the municipality can seek access to the bond proceeds. Forcing the Township to pay for the improvements before seeking relief from the courts, as Lexon suggests, would be contrary to the legislative intent behind Section 511 and deprive the Township of its statutory remedy. We thus conclude that the trial court did not err in exercising its equitable jurisdiction in this case.

■ We also reject Lexon's assertion that the Township has not averred irreparable harm, but merely speculative harm. Lexon characterizes the alleged harms as speculative because (1) the conditions the Township seeks to complete or correct have not yet caused any injury; and (2) the Township offered "unsubstantiated" estimates of the costs of correcting and completing the public improvements in a manner which Lexon claims is in conflict with a provision in the land development agreement that dictates the method by which damages should be quantified in the event of default.

**3.** Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202.

**4.** 53 P.S. § 10511.

The record, however, contains sufficient evidence upon which the trial court could determine that the conditions existing in the development could cause injury. Further, as to the cost estimates, the Township Engineer's testimony was sufficient to support the trial court's findings. As to Lexon's reliance upon Section 16 of the land development agreement (which provides the Township with the right to procure materials and labor at current open market prices), that provision does not appear to be applicable in this case, where the Township is seeking payment under the terms of the Bond. Keeping in mind our standard of review, we believe that the trial court had reasonable grounds upon which to base its legal conclusions relating to the irreparable harm element of the Township's case. Consequently, we conclude that the trial court did not err in determining that the Township established irreparable harm.

### b. Clear Right to Relief

Lexon raises four sub-issues: (1) whether the statute of limitations applicable to bond actions precludes the Township's claims; (2) whether the land development agreement bars or limits the Township's action against Lexon; (3) whether the Township acted negligently such as to preclude the Township's right to relief against Lexon; and (4) whether material issues of fact exist that preclude the grant of preliminary injunctive relief. We address these seriatim.

Sections 5523(2) and (3) of the Judicial Code, 42 Pa.C.S. § 5523(2) and (3), provide respectively for a one-year limitation period for an "action upon a bond given as security by a party in any matter," and for "an action upon any payment or performance bond." Lexon asserts, "[a] cause of action under a performance bond

accrues at the time that the principal fails to perform the underlying construction contract." Lexon Br. at 20 (citing *Turner Constr., Inc. v. American States Ins. Co.*, 397 Pa.Super. 29, 579 A.2d 915 (1990), *appeal denied*, 527 Pa. 603, 589 A.2d 693 (1991)). Lexon contends that the record demonstrates that the Township was, at the latest, aware on May 18, 2009, that Developer was in default, because it sent a letter to Developer that day noting the default and demanding that Developer complete the public improvements. The Township brought its claim on June 9, 2010. The trial court, however, determined that the periods of time during which the bankruptcy court stayed actions against Developer stopped the statute of limitations from running during those periods.

Lexon relies upon the following language in the bankruptcy court's order:

> If the Claimholder Defendants [receive] *a notice that a Bond ... was terminating, maturing or otherwise expiring,* the Claimholder Defendant shall give immediate notice to the Debtors before making a demand for turnover in sufficient time to protect the claimholder Defendants['] security before the Bond ... terminated, matured, or otherwise expired. During this period, any party may seek relief from the Court.

(R.R. at 89a.) Lexon also refers us to a federal court decision[5] for the proposition that an injunction does not toll the statute of limitations, especially, Lexon argues, when a party has the ability to seek relief from the bankruptcy court's stay. Lexon argues that the Township could "simply opt out of the injunction" by providing notice to Developer before making a demand under the Bond and also could have sought relief from the bankruptcy court.

5. *In re: Briscoe*, 448 F.3d 201 (3d Cir.2006).

The trial court, however, reasoned that the bankruptcy court's orders staying claims against Developer operated to exclude the period of the stays from the statutory limitation period based upon Section 5535(b) of the Judicial Code, 42 Pa. C.S. § 5535(b). Section 5535(b) of the Judicial Code provides that "[w]here the commencement of a civil action or proceeding has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action or proceeding must be commenced." Further, as the trial court noted, the bankruptcy court's order only provides that a claimholder can seek to be permitted to pursue a claim "if [the claimholder] receives a notice" that a bond is about to expire. Lexon, however, never asserted that it sent any notice to the Township that would trigger this right under the bankruptcy court's order. We also observe that the federal court decision does not necessarily apply to our review.

Lexon offers no response to the trial court's reliance upon Section 5535(b) of the Judicial Code, and we conclude that this provision of the Judicial Code provides support for the trial court's conclusion that Lexon cannot assert the statute of limitations as a defense to the Township's right to relief.

■ Lexon next argues that the Township did not establish a clear right to relief because it acted negligently in its performance and breached duties under the land development agreement. Lexon points to Section 15 of the land development agreement, which provides that homes within the development should not be occupied until all improvements are complete. (R.R. at 34a–35a.) Lexon contends that as a third-party beneficiary, surety, and assignee of Developer's rights under the land development agreement, Lexon had the right to rely on the Township's proper performance of its duties under the agreement and the Township violated the above noted provision. The record does not support Lexon's argument. Testimony of the Township's manager suggests that the Township did not prematurely permit habitation. (R.R. at 443a–44a.) According to his testimony, the land agreement's reference to completion before habitation pertained to sewer system requirements and construction of a "binder course," which appears to be the initial coat of asphalt on a new roadway. Section 15 of the land development agreement does not appear to require more. (R.R. at 43a–35a.) There is no indication in the record that Developer did not install a sewer system and complete a binder course on the roadways as a prerequisite under Section 15 to the issuance of occupancy permits.

Lexon also points to Section 24 of the agreement whereby "owner and Developer agree" that there will be no stockpiling of dirt on open space. (R.R. at 40a–41a.) That provision does not appear to place an affirmative obligation on the Township, but only requires that neither the owner nor Developer stockpile dirt.

Lexon also relies upon Section 25 of the agreement, which directs that Developer shall construct swales as described on plans before the construction of any structure that would create runoff that such swales are intended to control and so that there could be a "stabilization process before the erection and construction of any buildings." (R.R. at 41a.) Section 25 is also solely directed to the Developer.

Finally, Lexon asserts that the Township violated Section 14 of the agreement, which gives the Township inspection rights to determine whether construction has been carried on in compliance with the plans. (R.R. at 34a.) While Section 14 does give the Township the power to in-

spect, this provision does not speak in terms of duty to inspect.

More significantly, the Bond only provides a defense to Lexon if the Township failed to provide notice of the Developer's default under the land development agreement. The Bond provides that "[t]he Surety expressly agrees that its liability shall not be in any way discharged or impaired by any variation or violation, with or without its knowledge of the Obligee and/or the Principal. The Surety shall not have defense for non-payment under this Bond for any reason other than non-receipt of notice of its Principal's default." (R.R. at 65a.) Thus, Lexon's arguments relating to the Township's alleged failure to ensure compliance with provisions of the land development agreement have no merit as a defense to payment under the Bond.

■ Lexon's next argument is that the trial court erred in concluding that the Township's right to relief is clear because the following factual issues have not been resolved:

a. whether Developer completed construction of the public improvements under the agreement;

b. if work is uncompleted, what is the work to be done and what is the cost of the work;

c. if the work is defective, did the work comply with the agreement, plans, and specifications, and did the Township approve any of the work;

d. are the materials the Township wants to use to complete the project of a quality and quantity to satisfy the agreement, plans and specifications;

e. are the workmen and mechanics the Township wants to use necessary; and

f. are the prices for materials, labor, and equipment reasonable?

In our view, the record has sufficient evidence from which the trial court could conclude that the Township had established a clear right to relief. The testimony of the former Township engineer is descriptive enough to support the trial court's determinations regarding the condition of the public improvements that need to be repaired/maintained/completed, and the costs to accomplish those objectives. Further, as the trial court pointed out, the Bond provides for payment in full of the Bond amount if (1) Developer or Lexon have not satisfactorily completed the required improvements within time limits set forth in the land development agreement, and (2) the Township sends written notice to Developer's manager or solicitor that the improvements have not been made. (R.R. at 64a.)

Thus, as the trial court noted, under the terms of the Bond, Lexon does not have a defense for non-payment for any reason other than the failure of the Township to provide notice of Developer's default. Therefore, the alleged unresolved factual issues identified by Lexon are irrelevant to our analysis.

### c. Status Quo

■ The trial court concluded that granting the injunction would place the Township in the same position it would have been in if Developer had complied with the land development agreement and completed and repaired the public improvements. Lexon contends that the Township failed to establish that the granting of the preliminary injunction would maintain the status quo. In fact, Lexon asserts that the granting of the injunction altered the status quo. Courts have defined the term "status quo ante" as "the last peaceable and lawful uncontested status preceding the underlying controversy." *In Re Milton Hershey School Trust,*

807 A.2d 324 (Pa.Cmwlth.2002). Lexon cites *Shanaman v. Yellow Cab Company of Philadelphia*, 491 Pa. 516, 520–21, 421 A.2d 664, 667 (1980), for the proposition that the purpose of a mandatory preliminary injunction is to return the parties to the status quo, and, therefore, where a preliminary injunction disrupts the status quo rather than maintains it, a court should deny a request for mandatory preliminary injunctive relief.[6]

So an essential question in this case is: What was the last peaceable and uncontested status between the Township and Lexon? The point at which the Township and Developer first appeared to have a dispute occurred when (1) Developer failed to complete the public improvements, and (2) some of the public improvements that Developer had begun to complete (the binder course on the streets and the retention basins) failed.

From one perspective, the point at which the Township's status with Lexon was last peaceable occurred just before Lexon refused to comply with the Township's request to turn the Bond money over to the Township. Yet, because of the significance the MPC places on financial security for public improvements (and the consequential burden that falls upon a surety), the last peaceable point in the relationship between Lexon and the Township also relates back to the conditions existing in the development when Developer abandoned the work. Thus, from this alternate perspective, the status quo would be the state of the development and the public improvements when Developer abandoned its duties under the land development agreement.

At that time, Developer had not begun many of the public improvements (as reflected in the Township engineer's punch list). Developer, however, had completed some of the public improvements necessary to enable purchasers or residents to occupy the dwellings. For example, Developer had completed the binder course on the subdivision roadways. The record supports the conclusion that, at the time Developer completed the binder course, that work had been performed satisfactorily. According to the record and the trial court's findings, the binder course apparently later failed and now presents a danger to drivers and other users of the roadway. By way of analogy, in our decision in *Wayne Homeowners*, we concluded that requiring the developer in that case to restore retaining walls the developer had constructed to their initial, properly functioning condition, restored the status quo. Because the status quo of the roadway improvements included a safe roadway with a properly constructed binder course, we agree with the trial court that requiring Lexon to pay for the correction of flaws in the binder course would restore the status quo.

With these guidelines in mind, we believe the trial court erred in concluding that placing the Township in the position it

---

**6.** Some courts take a different view of mandatory injunctions, observing that while an ordinary preliminary injunction is prohibitory in nature and seeks to maintain the status quo pending a trial on the merits, mandatory injunctions alter the status quo by compelling a party to perform a positive act. *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir.1995). Thus, some courts appear to require a party to make a stronger showing of its right to relief because the injunction necessarily changes the status quo. In Pennsylvania, however, our courts require that the relief granted must not change the status quo *ante*. *Wayne Homeowners*, 893 A.2d at 207. Put another way, the grant of relief necessitates a change in status at the time a court grants injunctive relief, but the relief must not change the status that existed between the parties just before the conflict between them arose.

would be in if Developer had performed its mandatory public improvement work restores the status quo. To the contrary, placing the Township in the position it would be in if Developer had performed goes beyond restoration of the status quo and places the Township in an even better position than had ever previously existed. Accordingly, we conclude that the trial court erred in basing its status quo determinations on this reasoning.

With regard to the roadways, the trial court must limit the relief granted, as the roadways with a binder course were initially satisfactory until the trenches ultimately developed. (In other words, while the trial court correctly directed that the trenches in the roadway should be repaired, the initial binder course without trenches constitutes the status quo.)

As to the other items for which the trial court directed payment from the Bond, the trial court, on remand, should consider each item in light of the above discussion, keeping in mind that the status quo may be unique as to each. By way of example, one item on the Township's punch list was "curb repairs." In considering whether the Township is entitled to injunctive relief relating to this item, the trial court must consider whether the work pertaining to the curbs was correctly performed initially, but their condition changed over time. As in the case of the roadways, if the problems regarding the curbs did not exist initially, but developed and eventually caused the curbs to be in need of repair, the condition may have changed over time, and these items may be subject to payment under the Bond.

We will, therefore, vacate the trial court's order and remand the matter to the trial court for reconsideration of the

Township's request for preliminary injunctive relief.[7]

### *ORDER*

AND NOW, this 23rd day of February, 2011, the order of the trial court is VACATED, and the matter is REMANDED to the trial court for reconsideration of Hatfield Township's request for relief in a manner consistent with this opinion.

Jurisdiction relinquished.

DISSENTING OPINION BY Judge LEAVITT.

I respectfully dissent. I disagree with the majority's conclusion that the Township has satisfied the strict requirements for mandatory preliminary injunctive relief. Simply, the trial court's preliminary injunction to Lexon to pay $521,538.86 under a construction bond is an award of contract damages, which cannot be obtained in an equitable proceeding. *A fortiori*, a preliminary injunction to pay a discrete sum of money does not preserve the *status quo* but, rather, disturbs it. Accordingly, I would dissolve the trial court's mandatory preliminary injunction.

To proceed in equity, the plaintiff must plead the lack of an adequate remedy at law. *The Woods at Wayne Homeowners Association v. Gambone Brothers Construction Company, Inc.*, 893 A.2d 196, 204 (Pa.Cmwlth.2006). In deciding whether a remedy is adequate, "it is the remedy itself and not its possible lack of success that is the determining factor." *Willing v. Mazzocone*, 482 Pa. 377, 383, 393 A.2d 1155, 1158 (1978).

A preliminary injunction will issue where necessary to preserve the *status quo* as it existed before the acts complained of, while the court decides on the

---

**7.** We note that this decision does not affect the Township's ability to pursue the other claims in its Complaint for declaratory or permanent injunctive relief.

merits of permanent injunctive relief. *The Woods at Wayne Homeowners Association*, 893 A.2d at 204. The essential prerequisites of a preliminary injunction are as follows:

> (1) The injunction is necessary to prevent immediate and irreparable harm not compensable in money damages.
>
> (2) Greater injury will result from refusing the injunction than from granting it.
>
> (3) The injunction restores the parties to *status quo ante.*
>
> (4) The activity sought to be restrained is actionable, and the plaintiff's right to relief is clear.

*Id.* Our Supreme Court has emphasized the

> distinction between mandatory injunctions, which command the performance of some positive act to preserve the status quo, and prohibitory injunctions, which enjoin the doing of an act that will change the status quo. This Court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory. Thus, in reviewing the grant of a mandatory injunction, we have insisted that a clear right to relief in the plaintiff be established.

*Mazzie v. Commonwealth*, 495 Pa. 128, 134, 432 A.2d 985, 988 (1981).

The majority concludes that the Township satisfied the first essential prerequisite for obtaining injunctive relief, *i.e.* that the injunction is necessary to prevent immediate and irreparable harm not compensable in money damages. I disagree. The surety bond issued by Lexon to secure Developer's obligation to complete the roads, storm drains and sidewalks in Westport Farms is a contract. *See Beckwith Machinery Co. v. Asset Recovery Group,* Inc., 890 A.2d 403, 406 (Pa.Super.2005) ("As a surety agreement is a contract, we turn to its language to determine the extent of the surety's rights and liabilities."). Like any other party to a contract, the Township can pursue a civil action for Lexon's breach of any of the terms of the bond. Stated otherwise, the Township has an adequate remedy at law by which to obtain the remedy it seeks, an award of monetary damages.

The Pennsylvania Superior Court's decision in *Jostan Aluminum Products Co., Inc. v. Mount Carmel District Industrial Fund,* 256 Pa.Super. 353, 389 A.2d 1160 (1978), is, as Lexon points out, instructive. There, the plaintiff brought a suit in equity to obtain a mandatory injunction directing the defendants to construct and install a new roof on an industrial plant. The plaintiff argued that the injunction was necessary because the combination of machinery operated in the plant and the leaking roof created a dangerous condition for the employees who worked there. In rejecting the plaintiff's claim for injunctive relief, the Superior Court explained:

> Instantly, plaintiffs' complaint in equity seeks, in effect, restoration or replacement of a roof under the terms of a lease agreement. We perceive no reason why this claim cannot be pursued at law in an assumpsit action to recover damages.... *In other words, plaintiffs could simply sue under their lease.* Despite averments of irreparable harm, we think it clear that plaintiffs can obviate any further injury by presently engaging a contractor to make the necessary repairs or replacement pending resolution of the liability issue in an assumpsit action.

*Id.* at 1163 (emphasis added) (citation omitted). As did the plaintiffs in *Jostan Aluminum Products*, the Township can

arrange for the necessary repairs to be made in Westport Farms while it simultaneously initiates a civil action to enforce the Lexon bond. The trial court's preliminary injunction is an improper award of damages before the parties' contract claims and defenses have been adjudicated.[1]

A bond may operate as a contract of indemnity or of guaranty, or both. Our Supreme Court has explained that the difference lies "between an affirmative covenant for a specific thing and one of indemnity against damage by reason of the nonperformance of the thing specified." *Equitable Trust Co. v. National Surety Co.*, 214 Pa. 159, 162, 63 A. 699, 700 (1906). Stated another way, a bond securing a land development project can indemnify against loss, or it can guarantee completion of the work. To ascertain the nature of a bond, the court considers the language of the bond itself. *Purdy v. Massey*, 306 Pa. 288, 293, 159 A. 545, 546 (1932). Further, a "bond given pursuant to a contract incorporated in the bond, will be construed in the light of the terms of the contract and the attendant circumstances, but 'the obligation of a bond cannot be extended beyond the plain import of the words used.'" *Commonwealth, to Use of Pennsylvania Manufacturers' Association Casualty Insurance Co. v. Fidelity & Deposit Co. of Maryland*, 355 Pa. 434, 437, 50 A.2d 211, 212 (1947) (citation omitted).

The above principles must inform the meaning of the language of the Surety Bond issued by Lexon. It provides, in pertinent part:

NOW, THEREFORE, the condition of this obligation is such that if the [Developer] shall construct, or have constructed the improvements herein described in accordance with the [Development] Agreement and shall save the [Township] harmless from any loss, cost or damage by reason of its failure to complete said work, then this obligation shall be null and void, otherwise to remain in full force and effect.... If, however, neither the [Developer] nor *[Lexon] satisfactorily complete the improvements under the [Development] Agreement within such timeframes as are established by the [Development] Agreement ... [Lexon], upon receipt of written notice from the [Township's] manager or solicitor that the improvements have not been installed or completed in accordance with the [Development] Agreement ... shall pay to the [Township], within ten (10) business days from the date of such written notice, the entire principal amount of this bond* less any amounts previously authorized to be released from this obligation....

PROVIDED FURTHER, ... [Lexon] shall not have defense for non-payment under this Bond for any reason other than non-receipt of notice of [Developer's] default.

Reproduced Record at 64a–65a (R.R. ___) (emphasis added). The Development Agreement, incorporated by reference into the Surety Bond, states that "the Surety Bond is to be held in accordance with the provisions of this Agreement for the purpose, among other things, of paying for the cost of the Improvements." R.R. 23a. To that end, the Development Agreement provides:

---

1. The value of this preliminary injunction is not clear. The trial court asserted in its opinion that it believes that in the hearing on the permanent injunction, the Township will prove its right to relief under the applicable contracts. If it is otherwise decided, the Township will have to return $521,538.86 to Lexon.

If ... Developer does not elect to undertake the completion of the Improvements within said twenty (20) day period, [Lexon] shall pay to the Township, from time to time, promptly upon receipt by it of invoices from the Township, that portion of the remaining balance of the Surety Bond required to pay all of the costs of completing the Improvements.

R.R. 25a. Furthermore,

[i]n the event that the Improvements are not completed as required hereby, or in the event that ... Developer is otherwise in default of this Agreement, then any undrawn funds remaining under the Financial Security shall, upon draw by the Township, be paid to Township.... In completing said Improvements, Township may, at its option, have such Improvements completed by Developer or by independent contractors or by Township's employees or by any combination of the foregoing, as Township may elect.

R.R. 36a.

The above-cited provisions seem to provide that the Surety Bond obligations of Lexon are ones of both indemnity and guaranty. The Development Agreement authorizes the Township to complete the improvements and submit its expense statements to Lexon for payment, which would make Lexon's obligation one of indemnity. The bond itself also allows Lexon to do the improvements. However, if the Township notifies Lexon that the improvements have not been made, then Lexon must pay "the entire principal amount of this bond less amounts previously authorized to be released...." R.R. 64a. In sum, the Development Agreement and Surety Bond create different rights and remedies that need to be sorted out,

and in an assumpsit proceeding, not a motion for a preliminary injunction.

Section 511 of the Pennsylvania Municipalities Planning Code (MPC), 53 P.S. § 10511,[2] does not, as the majority suggests, command a different result in this case. Section 511 states, in relevant part:

In the event that any improvements which may be required have not been installed as provided in the subdivision and land development ordinance or in accord with the approved final plat *the governing body of the municipality is hereby granted the power to enforce any corporate bond, or other security by appropriate legal and equitable remedies.*

53 P.S. § 10511 (emphasis added). The emphasized language authorizes a governing body to enforce a bond by "appropriate legal and equitable remedies." The word "appropriate" applies to both the legal and the equitable remedy.

Were a surety bond obtained under Section 511 of the MPC a pure guaranty bond, a suit in equity to compel performance would be an "appropriate" equitable remedy. Indeed, it would be the only way to enforce the municipality's rights under such a surety bond. That is not the case here. The guaranty portion of the Surety Bond appears to be capable of invocation only by Lexon, which has retained the contract right to do the Developer's work as a way to discharge its bond obligation. If Lexon does not do so, then the Township can demand full payment of the Surety Bond amount.

Section 511 did not abolish the strict requirement that a plaintiff may proceed in equity only where that plaintiff lacks an adequate remedy at law. Section 511 did not authorize municipalities to use equity to displace or modify the terms of a developer's bond, including its enforcement pro-

**2.** Act of July 31, 1968, P.L. 805, *as amended,*     53 P.S. § 10511.

visions. Such an extreme result cannot be read into Section 511's brief sentence authorizing a municipality to demand and enforce a bond required of a developer by "appropriate" court action.

Equity follows the law. *First Federal Savings and Loan Association of Lancaster v. Swift*, 457 Pa. 206, 210, 321 A.2d 895, 897 (1974). A municipality cannot pursue injunctive relief simply because there are hurdles to a legal remedy that cannot be overcome, such as an expired statute of limitations. *See Jostan Aluminum Products*, 389 A.2d at 1164("(u)nder most authorities, the mere fact that the statute of limitations would bar a remedy at law is no ground in itself for applying to equity for relief unless plaintiff was prevented from suing by defendant's act.") To proceed in equity, the plaintiff must show the absence of a legal remedy. Here, the Township has a legal remedy by which it can obtain a judgment of $521,538.86—it is by an assumpsit action.

Finally, I disagree with the majority's conclusion that the injunction was necessary to maintain the *status quo ante*, which is the "last actual, peaceable (and, we may add, lawful) uncontested status which preceded the pending controversy." *Commonwealth v. Coward*, 489 Pa. 327, 342, 414 A.2d 91, 99 (1980). Indeed, the majority explains that "the relief must not change the status that existed between the parties just before the conflict between them arose." Op. at 556 n. 6. Applying the majority's own standard, then, it is difficult to comprehend how the status of the parties has not been changed by forcing Lexon to pay bond proceeds to the Township before the parties' contract rights and defenses have been adjudicated.

I would reverse the trial court's order issuing a mandatory preliminary injunction to Lexon.